No. 2--05--0111                                               2/28/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--344 |
| THOMAS J. LEWIS, | ) ) | Honorable Robert J. Anderson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Thomas J. Lewis, was charged with unlawful possession of gamma hydroxybutyric acid (GHB) with the intent to deliver (720 ILCS 570/401(a)(11) (West 2000)) and unlawful possession of heroin (720 ILCS 570/402(c) (West 2000)). He moved to suppress evidence that the police seized in a warrantless search of the room that he rented from his parents, John and Constance Lewis. The trial court denied the motion, holding that the search was lawful under the emergency exception to the fourth amendment's warrant requirement. See People v. Bondi, 130 Ill. App. 3d 536, 539 (1984). After a stipulated bench trial, defendant was found guilty of both counts, sentenced to seven years' imprisonment on the GHB charge, and not sentenced on the heroin charge. Defendant appeals, arguing that the court erred in denying his motion to suppress. We affirm.

At the hearing on his motion, defendant first called Amanda Scheller, a fire fighter /paramedic for the City of Naperville. She testified as follows. At about 7:41 a.m. on September 6, 2001, she and other paramedics went to 1559 Apache Drive in response to a report of "unconscious

DOA, possible DOA" and "possible DOA overdose."  On arriving, they found that defendant was unconscious but that his skin color was normal, not cyanotic (bluish), and that he was breathing independently.  Scheller did not recall whether there was a police officer on the scene when she and the others arrived.  Scheller testified that, aside from what dispatch told her, the police gave her no information about what defendant might have taken.  Scheller testified that, although she and the other paramedics did not yet know what defendant had taken, they gave him Narcan, which is routinely administered to people suspected of having overdosed on narcotics.  Giving Narcan is a "stopgap" measure, and defendant received the medication "just in case" he had used narcotics.  Defendant became "more conscious" and answered some questions.  At 8:05 a.m., the paramedics took him to the hospital.  On the way there, he told them that he had taken heroin, and they forwarded this information to the hospital.

Constance Lewis testified as follows.  At about 7:10 a.m. on September 6, 2001, she entered defendant's room, in the basement of the house.  She called out that it was time to wake up.  Defendant did not respond.  About 10 minutes later, Constance called again and received no answer.  She then shook defendant by the shoulder.  He said nothing and did not wake up, although his snoring pattern changed slightly.  Defendant's color looked normal and his lips were not cyanotic.

After talking things over with John Lewis, Constance went to the study near the front door of the house and called 911 while John went to defendant's room to try to wake him.  The court admitted a tape of Constance's 911 call.  Constance told the operator that defendant was not moving, would not wake up, and was unresponsive.  She added that, after speaking with a nurse, she believed that he might have taken drugs.  His breathing was irregular and his pupils were constricted.  The operator asked Constance if she knew what defendant had taken.  Constance said no.  The operator

said that an ambulance had been called, and she asked whether defendant might have taken prescription medicine. Constance responded that it was more likely "something like Ecstasy" but could have been something "entirely different." She said that, two years earlier, defendant had been treated for an Ecstasy overdose. The operator said that there might be a police officer who could respond before paramedics arrived. Constance replied that an officer (whom she later learned was Vincent Clark of the Naperville police department) was there. The operator told Constance to talk to Clark and ended the call. Constance directed Clark down the stairs to defendant's room.

About two minutes after Clark showed up, four or five paramedics arrived. Constance followed them to defendant's bedroom. The room was about 10 feet by 10 feet. In the middle was a futon, behind which was a 10-foot-long closet that lined the wall. A computer desk, with a wastebasket next to it, was about five feet from the futon. Constance went back upstairs; defendant, John, Clark, and the paramedics stayed. About 15 minutes later, defendant and the paramedics walked upstairs and left for the hospital.

Constance returned downstairs to turn off the lights. Clark and another police officer, Meier, were in defendant's room. Constance asked them to leave because she and John were going to the hospital. The officers refused, explaining that their only purpose was to find out what defendant had taken and that doing so might save his life. Constance then made several phone calls and learned that defendant had ingested heroin. She immediately told the officers this information and again asked them to leave the house. Again, they refused. Constance called the hospital; the doctors already knew that defendant had taken heroin. Next, Constance called a friend whose husband was a law professor and asked her to find out how to make the officers leave.

Constance returned downstairs and heard Clark tell Meier that they should get an "SW." Meier agreed. A few minutes later, Constance asked Meier what an "SW" was. Meier replied that he had no idea what she meant. About half an hour later, the officers told her that they would be obtaining a search warrant. By then, Clark had told Constance that he had found some folded-up foil packets in defendant's wastebasket and that the packets indicated drug use. At about 9 a.m., Constance and John went to the hospital. After they returned at 11:30 a.m., Officer Cali arrived and told Constance that the police had a search warrant. Constance asked to see it, but Cali pushed her into the bannister. Twenty minutes later, Detective Kammerer arrived and displayed the warrant.

John Lewis testified as follows. At about 7:20 a.m. on September 6, 2001, he joined Constance in defendant's room. Defendant was unconscious but snoring. John shook defendant and spoke to him, but he did not respond. Defendant was not pale or cyanotic. Constance left the room. John sat on the futon, next to defendant, with his back to the door. Soon, Clark entered the room. He said nothing but moved behind John. John could not see what Clark was doing, but Clark did not touch defendant. Shortly after Clark arrived, John heard that the paramedics were there, and he moved so that they could treat defendant. While John was in the room, he never saw Clark remove anything from the wastebasket. Clark never showed him any evidence and never told anyone that he found something in the wastebasket. John did not see Clark go into the closet. At some point, defendant regained consciousness, and he and the paramedics walked up the stairs and left the house.

John and Constance wanted to go to the hospital, so they told Clark and Meier to leave. The officers refused, explaining that they were trying to help defendant. At 11:35 a.m., after John and Constance had returned from the hospital, Officer Cali arrived. From downstairs, John heard a commotion as Cali shoved Constance. Several officers carrying bags entered and exited the house.

Defendant testified that he recollected very little of what happened on September 6, 2001. However, he stated that, before the police arrived, a lockbox was locked and sat on a refrigerator in his closet. Only defendant had keys to the lockbox; his parents probably did not know that it existed. Defendant also kept a metal box on his desk. This box had a clasp, not a lock, but it was closed when the police arrived. Defendant never gave anyone permission to open either box. On the morning of September 6, 2001, several pieces of crumpled tinfoil were in defendant's wastebasket. He had put them there the previous night after ingesting heroin and covered them with tissues and crumpled papers so that his family would not see the evidence of his drug use. Defendant did not use Ecstasy on September 5 or 6, 2001.

The State first called Officer Clark, who testified as follows. As of September 6, 2001, he had nine years' experience as a "first responder" and had investigated at least a dozen reports of drug overdoses. Clark was certified in administering basic first aid and had training in cardiopulmonary resuscitation. He was also trained in checking "ABCs," meaning "airway, breathing, and circulation." Sometime after 7:30 a.m. on September 6, 2001, while on patrol a block west of Apache Drive, Clark heard a report of a "possible DOA" involving a 21-year-old male who may have overdosed on Ecstasy. At 7:42 a.m., Clark arrived at defendant's home, where Constance Lewis directed him to defendant's room. There, John Lewis was sitting next to defendant, who was lying facedown on the futon. Defendant was extremely pale and his lips were purplish. Clark checked defendant's pulse and his breathing. Defendant was snoring and breathing normally, meaning that his airway was clear. Clark then shook defendant, but he did not respond. Clark talked to John for less than five seconds and obtained his permission to search the room in order to determine what defendant had taken. The paramedics had not yet arrived.

Clark looked into the wastebasket right next to the futon and saw the folded-up foil packets on top. Packets folded into "little squares," as these were, are called "snow seals" and are "usually related to drugs." Clark took the packets from the wastebasket. They contained a white powder that was not Ecstasy, which comes in pills. Next, Clark opened the metal box on the desk, finding a pacifier, razor blades, and plastic bags. From his experience, he associated these items with Ecstasy. Pacifiers prevent users from damaging their lips or tongues when the drug causes jaw clenching. Clark continued searching in order to find out what defendant had ingested so that he could tell the paramedics and the hospital personnel. He never searched outside defendant's bedroom.

Shortly after Clark saw the items in the metal box, the paramedics entered and started to treat defendant. Clark testified that he arrived at the house at 7:42 and that the paramedics arrived at 7:44, but that, unlike him, they had to unload and set up equipment before entering. However, he also testified that he had been in the bedroom for less than two minutes when the paramedics arrived and that he took less than two minutes to find the items in the wastebasket and the metal box. After the paramedics came, Clark did not aid defendant. He had already found the foil packets with the powdery residue, and he "more or less just pointed to [them]" to alert the paramedics. However, Clark was "more or less thinking that it was Ecstasy. That's what I told them I believed it was."

While the paramedics were working, Clark could not see whether defendant had regained consciousness. He kept trying to find evidence of Ecstasy. Looking directly into the closet, Clark saw the lockbox. He grabbed it and a key that appeared to fit it. The paramedics and defendant left the room. Clark did not arrange to contact Scheller while she was en route to the hospital. To Clark's knowledge, defendant had not yet told anyone what he had ingested.

Clark opened the lockbox. It contained no Ecstasy but did hold a bottle with a liquid of some sort, a substance that looked like bees' wax, and a bag. By then, Meier had arrived, and Clark told him that they would need an "SW." John asked what that meant. Meier explained that the police would be getting a search warrant. John then told the officers to leave, but they refused. Meier remained downstairs while Clark spoke to Kammerer in the driveway and recounted what had happened. Kammerer then left to obtain a search warrant. Clark returned to defendant's bedroom and waited for Kammerer to return with the search warrant. At about 11:55 a.m., Kammerer returned with the warrant. Later that day, another officer learned that defendant had ingested heroin. Clark then went to the fire station and spoke with Scheller, who told him that, en route to the hospital, defendant said that he had ingested heroin. Clark never told the paramedics about what he had found in the lockbox.

The trial court admitted tapes of radio communications involving Clark. In the first recording, the dispatcher notified Clark of a "possible DOA, possible overdose" at 1559 Apache Drive, where the "subject just won't wake up at this time." In the next message, the dispatcher added that "this could be a possible Ecstasy overdose" and that "possibly Ecstasy was used." Later, calling from defendant's bedroom, Clark reported that defendant was "unconscious but breathing." Afterward, Clark reported that defendant was "still out of it" but that defendant was breathing and "somewhat responsive to the paramedics' requests." He added that "it look[ed] like Ecst or something else" and that he had found "some paraphernalia and some pictures."

Detective Tom Kammerer of the Naperville police department testified as follows. At 8:11 a.m. on September 6, 2001, he arrived at defendant's home and spoke to Clark outside. Clark explained that he had responded to a report of a possible drug overdose; that the paramedics were

not sure what defendant had ingested; and that, while the paramedics treated defendant, Clark saw several items indicating drug use. These included the lockbox containing the unknown substance; the drug paraphernalia on the desk; and the foil wrappers. Clark added that defendant had been pale and that his lips had been turning blue. At about 8:20 a.m., Kammerer called the State's Attorney's office and reported what Clark had told him. Later that morning, Kammerer obtained a search warrant, searched defendant's room, and seized the items that Clark had described.

We summarize the trial judge's factual findings. In her 911 call, Constance Lewis said that defendant was unconscious and that she feared that he had overdosed on drugs, perhaps Ecstasy. "[A]lmost instantly," Clark arrived, went downstairs, and spoke briefly to John Lewis, who consented to a search of the room. Clark checked defendant's pulse, breathing, and color. (Although John testified that he did not see Clark do any of this, the judge credited Clark on this matter. However, the judge disbelieved Clark's testimony that defendant's lips were purplish. The judge commented that Clark was either "mistaken" or "not being candid.")

Clark made a "quick search of the room before the paramedics came." He saw the foil packets in plain view in the wastebasket. (The court discredited defendant's testimony that he concealed the packets.) Next, Clark opened the box on the desk and found the pacifier, leading him to believe that "this may be a situation involving Ecstasy." According to the judge:

> "I think the evidence is undisputed that the foil, and the powder on the foil, and the pacifier were found by the time the paramedics left. I'm finding, I guess, that the initial entry and the search were justified by the emergency nature of the call and by apparent consent by Mr. Lewis. [Defendant] was then taken to the hospital, and shortly after he was taken to the hospital, *** consent was withdrawn by Mr. and Mrs. Lewis."

The judge added later that "Mr. Lewis had a parent-authority [sic] to consent to the initial search." (Emphasis added.)

The judge also found as follows. Clark found the lockbox inside the closet but did not open it until after the paramedics left. When he opened the lockbox, Clark may not still have been looking for evidence that defendant had taken Ecstasy. Nonetheless, whatever Clark's motives by then, the foil packets and the paraphernalia in the metal box provided sufficient grounds for the search warrant.

The judge observed that, under Illinois law, a warrantless emergency search is proper if (1) there are reasonable grounds to believe that an emergency is at hand and that there is an immediate need for assistance for the protection of life or property; (2) the search is not motivated primarily by the intent to arrest a suspect or seize evidence; and (3) there is a reasonable basis, approximating probable cause, to associate the emergency with the area searched. Bondi, 130 Ill. App. 3d at 539. Noting that there really had been an emergency and that the search was limited to defendant's bedroom, the judge upheld the search. Defendant was convicted and sentenced as noted, and he timely appealed.

Defendant contends that the trial court erred in applying the emergency-assistance doctrine. He concedes the existence of the first Bondi factor, reasonable grounds to believe that there was an emergency requiring immediate police assistance. However, he maintains that the evidence shows that Clark undertook the search primarily to find evidence of a crime and that the area of the search exceeded what was necessary to address defendant's medical emergency.

We affirm the trial court's ruling. Although we consider sound the first and third factors of

the Bondi test,[1] we depart from Bondi and its progeny (see, e.g., People v. Feddor, 355 Ill. App. 3d 325 (2005); People v. Paudel, 244 Ill. App. 3d 931 (1993); People v. Krueger, 208 Ill. App. 3d 897 (1991)) on factor two, which requires that the search not be primarily motivated by the intent to arrest a suspect or seize evidence (Bondi, 130 Ill. App. 3d at 539). That is, we hold that scrutiny of an emergency-assistance search should be based on the objective circumstances of the situation, not on the subjective motives of the officers involved. Accordingly, we hold that an emergency-assistance search is valid where the following two factors are satisfied: (1) there are reasonable grounds to believe that there is an emergency that requires the intrusion; and (2) there is a reasonable basis, approximating probable cause, to associate the emergency with the area searched.[2] Alternatively, we hold that, even under Bondi, the trial court's ruling was proper.

---

[1]Part three of the Bondi test is substantively sound, but, as we note below, there is one aspect of its formulation that requires some explanation.

[2]Although the State has not argued that the Bondi test ought to be modified, we may affirm the trial court's judgment on any basis of record. See People v. Lee, 344 Ill. App. 3d 851, 853 (2003). Also, where the interests of justice require, we may decide a purely legal issue even if the

parties have not raised it or had the chance to brief it.  See <u>Hux v. Raben</u>, 38 Ill. 2d 223, 225 (1967).

In reviewing a ruling on a motion to suppress, we accept the trial court's findings of fact as long as they are not against the manifest weight of the evidence, but we review de novo the court's ultimate ruling on the legality of the search or seizure. People v. Pitman, 211 Ill. 2d 502, 512 (2004). A warrantless search or seizure is impermissible unless it fits within a specifically established and well-delineated exception to the warrant requirement. Mincey v. Arizona, 437 U.S. 385, 390, 57 L. Ed. 2d 290, 298-99, 98 S. Ct. 2408, 2412 (1978). The United States Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528 (1973), is often cited as the originator of the community caretaking or public safety exception to the warrant requirement. In Cady, the defendant's car was towed to a private lot after a car accident. Because the police reasonably believed that the car contained a gun that might be taken by vandals while the car sat unattended in the lot, the Supreme Court held that a search of the car for "the protection of the public" was permissible. Cady, 413 U.S. at 447, 37 L. Ed. 2d at 718, 93 S. Ct. at 2531. Cady explained:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal

statute. _Cady_, 413 U.S. at 433, 37 L. Ed. 2d at 714-15, 93 S. Ct. at 2528.

In _People v. Smith_, 346 Ill. App. 3d 146, 161 2004 , this court recognized that a suspicionless emergency seizure of a stranded motorist did not violate the fourth amendment.

We explain our disagreement with the Bondi test by first noting its source. Bondi derived its test from Professor Wayne LaFave's treatise on the fourth amendment. See 2 W. LaFave, Search & Seizure §6.6(a), at 469 (1978). Professor LaFave himself derived the test from People v. Mitchell, 39 N.Y.2d 173, 177-78, 383 N.Y.S.2d 246, 248, 347 N.E.2d 607, 609 (1976), a foundational decision of the New York Court of Appeals that has been discussed in nearly a hundred cases. Mitchell held that a valid emergency-assistance search requires that there be reasonable grounds to believe that there is an emergency requiring immediate assistance; that the search not be "primarily motivated by [the] intent to arrest and seize evidence"; and that there be "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." (Emphasis added.) Mitchell, 39 N.Y.2d at 177-78, 383 N.Y.S.2d at 248, 347 N.E.2d at 609.

As noted above, our disagreement with the test formulated in Mitchell and adopted by Bondi is over the relevance of the subjective motives of the officer. Nearly every court that has specifically considered whether the validity of an emergency search should turn on the officer's subjective motives has agreed with Mitchell that it should.[3] The question is whether including such a specific-intent requirement is sound law.

_____

[3]See Bondi, 130 Ill. App. 3d at 539; United States v. Cervantes, 219 F.3d 882, 890 (9th Cir. 2000); Gallmeyer v. State, 640 P.2d 837, 842 (Alaska App. 1982); People v. Ray, 21 Cal. 4th 464, 477, 981 P.2d 928, 933, 88 Cal. Rptr. 2d 1, 6-7 (1999); People v. Hebert, 46 P.3d 473, 479 (Colo.

No. 2--05--0111

2002); State v. Jones, 24 Kan. App. 405, 413, 947 P.2d 1030, 1037 (1997); State v. MacElman, 149 N.H. 795, 798, 834 A.2d 322, 326 (2003); State v. Ryon, 137 N.M. 174, 188, 108 P.3d 1032, 1046 (2005); State v. Matthews, 665 N.W.2d 28, 37 (N.D. 2003); State v. Follett, 115 Or. App. 672, 679-80, 840 P.2d 1298, 1301-02 (1992); Salt Lake City v. Davidson, 994 P.2d 1283, 1286-87 (Utah App. 2000); State v. Mountford, 171 Vt. 487, 490-91, 769 A.2d 639, 644-45 (2000); Commonwealth v. Waters, 20 Va. App. 285, 290-91, 456 S.E.2d 527, 530 (1995); State v. Loewen, 97 Wash. 2d 562, 567-68, 647 P.2d 489, 493 (1982); State v. Boggess, 115 Wis. 2d 443, 450-51, 340 N.W.2d 516, 521 (1983).  Contra State v. Carlson, 548 N.W.2d 138, 141-42 (Iowa 1996).

The proper resolution of this issue is not clearly dictated by binding precedent. Neither the United States Supreme Court nor our supreme court has explicitly adopted or rejected the proposition that the officer's subjective motivation is legally relevant to the validity of an emergency-assistance search. Their decisions nonetheless foreclose this proposition.

We may begin with the Supreme Court's statement that "[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' [citation], and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71, 86 L. Ed. 2d 370, 378, 105 S. Ct. 2778, 2783 (1985). Thus, for example, a traffic stop that is supported by probable cause to believe that the defendant has violated traffic laws is valid regardless of whether the officer's real purpose is to discover evidence of other crimes. Whren v. United States, 517 U.S. 806, 811, 135 L. Ed. 2d 89, 96-97, 116 S. Ct. 1769, 1773 (1996).

As Whren recognized, the Court has held that a warrantless inventory or administrative search, which, under the law, need not be supported by any particularized suspicion of criminal activity, may be invalid if the officer's real purpose is to look for evidence of a crime. Whren, 517 U.S. at 811, 135 L. Ed. 2d at 96-97, 116 S. Ct. at 1773; see Florida v. Wells, 495 U.S. 1, 4, 109 L. Ed. 2d 1, 6, 110 S. Ct. 1632, 1635 (1990) (inventory search); Colorado v. Bertine, 479 U.S. 367, 372, 93 L. Ed. 2d 739, 746, 107 S. Ct. 738, 741 (1987) (inventory search); New York v. Burger, 482 U.S. 691, 716 n.27, 96 L. Ed. 2d 601, 623 n.27, 107 S. Ct. 2636, 2651 n.27 (1987) (administrative search). However, Whren distinguished between such searches and ones based on probable cause:

"[O]nly an undiscerning reader would regard [Wells, Bertine, and Burger] as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of

probable cause to believe that a violation of law has occurred. In each case, we were addressing the validity of a search conducted in the absence of probable cause." (Emphasis in original.) Whren, 517 U.S. at 811, 135 L. Ed. 2d at 96-97, 116 S. Ct. at 1773.

Although Whren draws a clear line between inventory and administrative searches (on one side) and criminal searches based on probable cause (on the other), a discerning reader might well hesitate to say on which side of the line emergency-assistance searches fall. As noted, emergency-assistance searches are exercises of the police's "community caretaking" function. See Cady, 413 U.S. at 441-43, 37 L. Ed. 2d at 714-16, 93 S. Ct. at 2528-29; Cervantes, 219 F.3d at 889. Therefore, they do not require probable cause--at least in the criminal sense. However, unlike inventory and administrative searches, emergency-assistance searches are not "undertaken pursuant to a general scheme without individualized suspicion" (City of Indianapolis v. Edmond, 531 U.S. 32, 45-46, 148 L. Ed. 2d 333, 346, 121 S. Ct. 447, 456 (2000)). Although the officer need not have probable cause to believe that a crime has been committed, he or she must have reasonable grounds to believe that there is an emergency requiring immediate assistance. People v. McGee, 140 Ill. App. 3d 677, 680 (1986); People v. Brooks, 7 Ill. App. 3d 767, 775 (1972). Also, the need to respond to an emergency does not give the police a general warrant to search wherever they want. Rather, the intrusion "must be 'strictly circumscribed by the exigencies which justify its initiation.' " Mincey, 437 U.S. at 393, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413, quoting Terry v. Ohio, 392 U.S. 1, 26, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1882 (1968). Thus, unlike an inventory or administrative search, an emergency-assistance search does require a type of individualized suspicion, albeit not one of criminal activity.

Where a warrantless search does not require individualized suspicion of any sort (criminal or noncriminal), requiring a proper motive is practically the only way to protect the privacy of the

person whose property is being searched. Courts provide this restraint directly, by scrutinizing the officer's motivation (see Bertine, 479 U.S. at 375, 93 L. Ed. 2d at 748, 107 S. Ct. at 743), and indirectly, by inquiring whether the search adhered to a valid policy that limited the discretion of the officer and thus provided a " 'constitutionally adequate substitute for a warrant' " (Burger, 482 U.S. at 703, 96 L. Ed. 2d at 614, 107 S. Ct. at 2644, quoting Donovan v. Dewey, 452 U.S. 594, 603, 69 L. Ed. 2d 262, 272, 101 S. Ct. 2534, 2540 (1981); see also Bertine, 479 U.S. at 375-76, 93 L. Ed. 2d at 748, 107 S. Ct. at 743). Because a suspicionless search does not rest on particularized need, requiring a proper motive is crucial to prevent "general rummaging in order to discover incriminating evidence" (Wells, 495 U.S. at 4, 109 L. Ed. 2d at 6, 110 S. Ct. at 1635).

We believe that these considerations do not apply to a search that already requires particularized suspicion, albeit not probable cause in the criminal sense.[4]  Where a valid search

---

[4]Indeed, the Supreme Court has held that the warrantless search of a probationer's home, which requires only reasonable suspicion of criminal activity rather than probable cause, is valid regardless of the actual motivations of the officers conducting the search. United States v. Knights, 534 U.S. 112, 121-22, 151 L. Ed. 2d 497, 506-07, 122 S. Ct. 587, 592-93 (2001).  Thus, the presence of probable cause is not a prerequisite to applying the rule of Macon and Whren instead of the motives-sensitive test applied to inventory and administrative searches.  It would be anomalous to hold that a search that requires only reasonable suspicion may be pretextual but that one that requires probable cause may not.  Knights indicates that the crucial distinction is not between searches that are supported by criminal probable cause and those that are not, but between searches that are based

already requires particularized suspicion, <u>even if not of the criminal variety</u>, the discretion of the officer is already limited and the need to inquire into his motives is greatly attenuated if not eliminated.

Courts that require an emergency search to have a proper purpose reason that, absent a requirement of probable cause in the criminal sense, a motives test is necessary to prevent the police from using the emergency as a pretext to search for incriminating evidence that would otherwise be out of reach. See <u>Cervantes</u>, 219 F.3d at 890; <u>Ray</u>, 21 Cal. 4th at 477, 981 P.2d at 937-38, 88 Cal. Rptr. 2d at 11-12; <u>Mountford</u>, 171 Vt. at 491-92, 769 A.2d at 645; <u>Gallmeyer</u>, 640 P.2d at 842. We disagree. The requirement of probable cause, albeit of a noncriminal sort, combined with the restriction of the search to an area reasonably associated with the emergency, ought to deter the officer from rummaging around at will for evidence of a crime. Such evidence will be inadmissible unless it is obtained by conduct that is an objectively reasonable response to the emergency. This requirement of objective reasonableness makes the inquiry into the officer's intent unnecessary for the same reasons that such an inquiry is unnecessary in the criminal-search context. As the Iowa Supreme Court reasoned in rejecting <u>Mitchell</u>'s three-part test, "the officers' subjective thinking processes shed little light on the reasonableness of the intrusion." <u>Carlson</u>, 548 N.W.2d at 141.

---

on particularized suspicion of some sort and those that require none.

Moreover, we agree with another court that a requirement of specific intent is not only superfluous but likely to make the law less evenhanded. In <u>People v. Woods</u>, 21 Cal. 4th 668, 981 P.2d 1019, 88 Cal. Rptr. 2d 88 (1999), Officer Wielsch seized evidence pursuant to a warrantless search of the home of Loza, who had agreed to such searches as a valid condition of her probation. The search uncovered evidence that led to charges against Woods and Benson. The trial court suppressed the evidence because Wielsch's real motive was not to monitor Loza's compliance with probation but to search for incriminating evidence against Loza's roommate Mofield. The California Supreme Court reversed. The court noted that another officer might have conducted the same search under the same circumstances but testified convincingly that she did so to determine whether Loza was complying with probation. In that case, "[i]f subjective intent were the controlling factor, then defendants' suppression motion would not have succeeded even though the officer had conducted her search no differently than Wielsch." <u>Woods</u>, 21 Cal. 4th at 681, 981 P.2d at 1027, 88 Cal. Rptr. 2d at 97. We believe that this reasoning applies equally to emergency-assistance searches.

Although we have no disagreement with the substance of part three of <u>Bondi</u>, we feel it necessary to address one aspect of its current formulation that might cause confusion. Part three requires " '<u>some reasonable basis, approximating probable cause</u>, to associate the emergency with the area or place to be searched." (Emphasis added.) <u>Bondi</u>, 130 Ill. App. 3d at 539, quoting 2 W. LaFave, Search & Seizure ¢6.6(a), at 469 (1978). "Reasonable basis" and "probable cause" are not distinct standards in this context.[5] The overarching standard of the fourth amendment is, after all,

_____

[5]Respecting seizures of the person, there indeed is a difference between probable cause and the lesser standard of reasonable suspicion, for each justifies a different degree of intrusion on the

simple reasonableness.  Vernonia School District 47J v. Acton, 515 U.S. 646, 652, 132 L. Ed. 2d 564, 574, 115 S. Ct. 2386, 2390 (1995); Elkins v. United States, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680, 80 S. Ct. 1437, 1446 (1960).  With certain exceptions, reasonableness requires a warrant issued on probable cause.  People v. Luedemann, 357 Ill. App. 3d 411, 420 (2005).  Even searches conducted without a warrant generally require probable cause (People v. McGee, 268 Ill. App. 3d 32, 40 (1994)), including emergency-assistance searches (3 W. LaFave, Search & Seizure §6.6(a), at 452 (4th ed. 2004).  But whether defined in terms of probable cause or not, the controlling criterion is one of reasonableness, as decisions from the United States Supreme Court and our supreme court indicate.  In Mincey, the United States Supreme Court said that warrantless searches and seizures are permissible where the police "reasonably believe that a person within is in need of immediate aid."  Mincey, 437 U.S. at 392, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413.

Our supreme court took a similar approach in two cases, People v. Smith, 44 Ill. 2d 82 (1969) (Smith I), and People v. Smith, 47 Ill. 2d 161 (1970) (Smith II).  In Smith I, the police found the defendant semiconscious and seriously wounded in the aftermath of a shootout with the victim.  The police seized the defendant's wallet from his clothes and found a note inside that spoke of his intent

---

person.  See People v. Murray, 137 Ill. 2d 382, 387 (1990).  According to Professor LaFave, the text of the fourth amendment requires probable cause for all seizures of the person, but this probable cause standard permits a sliding scale where the degree of the intrusion on the person determines the required degree of probability that the person is involved in criminal activity.  4 W. LaFave, Search & Seizure §c9.1(d), 9.5(b), at 275-79, 479-80 (4th ed. 2004).

to kill the victim. The State used the note in its prosecution of the defendant for murder. Although recognizing that the defendant was not suspected of a crime when first found, the supreme court held that the seizure of the wallet was nonetheless "reasonable" because of the "pressing circumstances" facing the police. Smith I, 44 Ill. 2d at 87-88. The court reasoned that the wallet "might provide information of value in the handling of the wounded man, e.g., information concerning his blood type, being a diabetic, being unable to tolerate certain medications or anaesthetics, religious affiliation." Smith I, 44 Ill. 2d at 87-88.

In Smith II, the police, responding to a call that a man was "down" in the hallway of a hotel, found the defendant lying on a landing in the hotel. He did not wake when the officers shook him. The officers detected no signs that the defendant had been drinking. They helped him stand, whereupon he regained consciousness but was incoherent. The police told the defendant that he was under arrest for disorderly conduct. They frisked him for weapons but found none. When the defendant failed to answer questions concerning his identity and what he was doing in the hotel, the police searched him for identification and found illegal drugs. Smith II, 47 Ill. 2d at 162-63. The defendant argued that the police exceeded the scope of a search incident to arrest, which is limited to a search for weapons and the fruits of the crime that is the basis for the arrest--which, defendant emphasized, was in his case disorderly conduct, not possession of illegal drugs. The supreme court held that the warrantless search was justified in light of the potentially dire condition of the defendant:

> "The constitutional prohibition is against unreasonable searches and seizures and what is
> reasonable or unreasonable is dependent upon the facts of each individual case. *** Here
> the officers were summoned to investigate the circumstances involving a distressed person.

They found him in a stupor, not intoxicated apparently, for there was no odor of alcohol. But he was totally disoriented and incoherent, unable to answer their questions as to his condition or identity. For all they knew he may have been a diabetic in shock or a distressed cardiac patient. *** This was an emergency situation where the welfare of the individual was at stake." Smith II, 47 Ill. 2d at 163-64.

Under Mincey, Smith I, and Smith II, the criterion governing emergency-assistance searches is one of simple reasonableness.

In sum, we hold that the validity of an emergency-assistance search must be determined solely by (1) whether there are reasonable grounds to believe that there is an emergency that requires immediate assistance; and (2) whether there is a reasonable basis, approximating probable cause, to associate the emergency with the area searched. We now apply this law to the present case.

Initially, defendant challenges some of the trial court's findings of historical fact. Although defendant's brief does not clearly separate the factual issues from the legal ones, he appears to contend that: (1) the trial court erred in concluding that Clark actually examined defendant's medical signs; (2) the evidence shows that Clark never assisted the paramedics; (3) the trial court erred in finding that Clark discovered the foil packets in plain view; and (4) Clark's discredited testimony about defendant's skin color shows that Clark was not credible. We disagree and conclude that the trial court's factual findings are not against the manifest weight of the evidence.

Defendant's first contention, that Clark never treated him, is based on John Lewis's testimony and on a tape of one of Clark's radio communications. However, Clark, a "first responder" who was trained in first aid, testified that he checked defendant's pulse and "ABCs." Also, on the tape, Clark said that defendant was "unconscious but breathing." Defendant asks us to reweigh the evidence and

believe John instead of Clark. However, we must defer to the trial court's resolution of this factual issue. Defendant's second contention, that Clark never assisted the paramedics, does not contradict an explicit trial court finding. However, neither is it a necessary inference from the evidence, despite the fact that Scheller testified that she did not recall seeing a police officer at the scene when she arrived and that the only information she received from the police regarding defendant's condition was from the dispatcher. Clark, whom the trial court generally credited, testified that he pointed out the foil packets to the paramedics and told the paramedics that he believed that the cause of defendant's problem "was Ecstasy." We cannot presume that the trial court discredited this testimony.

Defendant's third contention, that the court erred in finding that Clark discovered the foil packets in plain view, is based on Clark's failure to mention them in a radio communication. However, Clark testified that he found the packets in plain view, and the trial court had the prerogative to credit that testimony. Clark's failure to mention his discovery when he radioed headquarters did not require the court to conclude that Clark had not found the packets by that time. More important, it did not require the court to conclude that Clark did not find the packets until after defendant's parents withdrew their consent to search. Finally, the mere fact that the trial judge discredited Clark's testimony about whether defendant was cyanotic did not compel the court to disbelieve everything that Clark said. In any event, defendant suggests only that Clark's "embellishment" gave the court reason to doubt Clark's motives for conducting the search. However, under the legal rule that we now adopt, Clark's motives are not relevant to the validity of the search.

No. 2--05--0111

We accept the trial court's factual findings and now turn to defendant's legal arguments. Defendant distinguishes between two stages of the search: one before he was taken to the hospital and one afterward. He contends that: (1) the initial search of his bedroom violated the fourth amendment because it was primarily motivated by the intent to discover and seize evidence of a crime; and (2) the later search of his bedroom violated the fourth amendment because (a) it was improperly motivated; and (b) Clark's conduct, especially the opening and examination of the lockbox, was not reasonably related to the emergency. For the reasons that follow, we reject both contentions.

Defendant's first contention is unsound for several reasons. First, because defendant argues only that the initial search did not satisfy the motives test of Bondi, our rejection of that aspect of Bondi makes defendant's argument legally irrelevant. Second, even were we to adhere to Bondi's test, we would uphold the initial search as consensual. The trial court specifically found that John Lewis consented to the initial search of defendant's bedroom and that the consent was not withdrawn until after defendant and the paramedics left. Defendant does not argue that John lacked the authority (real or apparent) to consent to the initial search. Third, the foil packets would be admissible under the plain-view doctrine. The trial court credited Clark's testimony that the packets were in plain view and that the way that they were folded, and the presence of the residue, meant that they probably contained illegal drugs. As Clark had the right to be in the bedroom, it follows that Clark could seize the packets, as "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities" (Mincey, 437 U.S. at 393, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413).

In any event, even were we to consider Clark's motives crucial, we would have to uphold the trial court's finding that Clark was not primarily trying to find evidence of a crime. Defendant's contention otherwise is based on what he sees as (1) Clark's failure to assist the paramedics; (2) Clark's incorrect testimony that defendant's lips were purplish; and (3) the rapidity with which Clark called for Kammerer, a detective, and sought a search warrant. However, there is no dispute that Clark originally believed from the dispatch that defendant may have been the victim of an Ecstasy overdose. The trial court found that Clark did render emergency assistance, and Clark testified that he pointed out the foil packets and told the paramedics that he believed that the cause of defendant's ill-being was Ecstasy. Also, as we held, although the trial court discredited Clark's testimony that defendant's lips were cyanotic, the court did not have to reject Clark's testimony in general.

Finally, because Clark believed that defendant's condition resulted from illegal drugs of some sort, his efforts to discover the cause of the problem necessarily involved searching for evidence of a crime. Thus, it proves little to note that, after Clark had discovered the foil packets in the wastebasket and the Ecstasy-related paraphernalia in the box on the desk, he contacted a detective and discussed the need for a search warrant. These acts followed from Clark's search, but they did not prove that his original motivation was unrelated to the emergency.

Having concluded that the initial search of defendant's bedroom was proper, we turn to defendant's challenge to the later search, which Clark undertook after defendant left the house. Because the trial court found that only the initial search was consensual, and because Constance Lewis withdrew her consent very shortly after defendant left the house, we decline the State's request to affirm the later search as consensual. However, we hold that the search, including the opening of the lockbox, was proper under the emergency-assistance doctrine.

Defendant argues first that the evidence proves that, by the time Clark opened the lockbox, he was no longer concerned with the emergency. Defendant observes that the trial court doubted that Clark opened the lockbox in order to ascertain whether defendant had taken Ecstasy. Defendant also contends that (1) any attempt to argue that Clark was still searching for evidence of recent Ecstasy use is untenable because the paramedics had administered Narcan, which is given for narcotics overdoses and not when someone has used Ecstasy; and (2) had Clark been concerned with defendant's medical emergency, he would have contacted the paramedics or the hospital and told them what he had found.

Our holding that the officer's motives are legally irrelevant to the validity of an emergency-assistance search disposes of defendant's argument. In any event, while the issue of Clark's motivation is admittedly a close one, the trial court could conclude that, when Clark opened the lockbox, he was still searching for clues to exactly what defendant had taken. Defendant's assertion that the administration of Narcan ruled out Ecstasy misreads Scheller's testimony; she stated that Narcan is routinely administered even where (as here) it is unknown whether the person actually used any narcotics. Further, Kammerer testified that Clark said that the paramedics still did not know what defendant had taken. Clark's initial search had revealed a box containing only drug-related paraphernalia. The trial court could conclude that, in opening the lockbox, Clark was still trying to learn what drugs defendant had recently used. Although Clark's failure to arrange to contact Scheller while she was en route to the hospital may cast some doubt on this conclusion, it is not dispositive. We note that Clark did contact Scheller later in the day.

Defendant also argues that the later search, in particular the opening of the lockbox, was not reasonably related to the medical emergency that justified Clark's intervention originally.

Defendant's argument is based primarily on the same factors that he cites in arguing that the later search was undertaken in order to find evidence of a crime. What we have said in assessing that argument applies here. Under the facts as the trial court found them, a reasonable police officer could have opened and examined the lockbox in response to the ongoing emergency. When he did so, Clark still did not know what defendant had taken, and (according to Kammerer) Clark believed that the paramedics did not know either. Clark had just found a box containing drug paraphernalia, but no drugs, and he could reasonably suspect that a locked box stored in a closet directly behind the futon could shed light on defendant's condition. We hold that the trial court did not err in finding that the later search was reasonably related to the emergency.

The trial court properly denied defendant's motion to suppress. As defendant raises no other issues, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

CALLUM and KAPALA, JJ., concur.