No. 2-23-0516
Opinion filed July 8, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 22-CF-765 |
| CHRISTOPHER R. CUMMINS, | ) ) | Honorable Julia A. Yetter, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    The State has filed an interlocutory appeal (see Ill. S. Ct. R. 604(a) (eff. Oct. 19, 2023)) of the trial court's order granting the motion of defendant, Christopher R. Cummins, to suppress evidence the police obtained via a warrantless and nonconsensual search of his residence. The State argues that the emergency exception to the fourth amendment's warrant requirement validated the entry and search. We agree and reverse.

¶ 2                                  I. BACKGROUND

¶ 3    The State charged defendant with nine counts of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2020)), one count of unlawful possession of firearm ammunition by a felon (*id.*), and one count of possession of a firearm by a person not eligible for

a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2020)). All of the offenses were allegedly committed on April 27, 2022.

¶ 4    Defendant moved to suppress all evidence obtained directly or indirectly from the search of his house. His motion alleged the following. On April 27, 2022, at approximately 2:31 a.m., St. Charles police officers were dispatched to defendant's home in response to a noise complaint. On arriving, they heard extremely loud music coming from inside the house but could not see anyone inside. At about 3:46 a.m., officers made a warrantless entry into the house, where they found defendant asleep on a couch. They arrested him, seized evidence, and learned of more evidence. Defendant argued that the arrest and search were the fruits of an unconstitutional entry into his house.

¶ 5    The trial court held a hearing on defendant's motion. Bryce Rentschler testified as follows. On April 27, 2022, he was a police officer on patrol. At 2:31 a.m., he drove to South Second Street in St. Charles in response to a complaint of noise coming from a two-story house. On arriving, he parked on South Second Street, across from the house's front (west) entrance. Extremely loud music was coming from the house, and lights were on inside. Rentschler approached the steps to the front door. Although that door was solid, to the right of the steps was an exterior room with windows, through which Rentschler could view most of the first floor. He knocked on the front door and announced his office but got no response. He saw no one inside but heard a dog barking. Rentschler walked to the north side of the house, on Horne Street, where he saw two exterior doors. The north exterior door to the east was glass, and the door behind it was solid and slightly ajar. Rentschler pounded on both exterior doors on the north side and announced his office, but he got no response. There were no signs of movement in the house.

¶ 6 Rentschler testified that, after about half an hour of canvassing the house's doors to no avail, he contacted his supervisor, Sergeant Dan Kuttner. When Kuttner arrived, Rentschler had not spoken to anyone else, had not discussed with Kuttner whether to obtain a search warrant, and had not called the city to cut off the electricity to the house. Rentschler saw a vehicle parked in the driveway on the northeast corner of the lot. Rentschler ran the vehicle's license plate, but he could not recall when.

¶ 7 Rentschler testified that he and Kuttner considered ways to contact someone inside the house. Kuttner searched on his squad car's computer for possible residents, and Rentschler returned to the house. Looking through the east door on Horne Street, Rentschler saw a door directly across on the south side of the house. Rentschler walked around to the south door. He tried to contact anyone inside but again got no results. He saw no signs of movement inside.

¶ 8 Rentschler stated that he and Kuttner spoke to the neighbor who had made the noise complaint. The neighbor said that there was a recurrent issue with noise coming from the house late at night and that defendant had resided there since his father passed away. The neighbor "believed that [defendant] was home upon seeing his vehicle [in] the driveway." At that point, Kuttner called for more officers. Rentschler testified that, at some point, he checked his squad car's computer for information about defendant, but he could not remember when he did so. The computer check returned a Rolling Meadows, Illinois address and stated that defendant's FOID card was revoked.

¶ 9 Rentschler testified that, after he had been on the scene for about an hour, additional officers arrived. He and Kuttner planned to have the officers simultaneously pound on all the exterior doors except the south door to make contact with anyone inside. They also discussed whether they might need to enter the house "to see if anybody was under any type of medical

emergency or under duress of any sort." The pounding yielded nothing, so it was decided that the officers would enter the building. Asked the purpose of the entry, Rentschler testified: "Series of attempting to see if anybody [was] under any type of medical emergency, duress, and Sergeant Kuttner had communicated with our commander that there was a community caretaking aspect in regards to the firearms that I and other officers had observed from the southern most [*sic*] exterior door." About his reference to firearms, Rentschler explained that, as he initially approached the south door, he saw, in what appeared to be the dining room, a cabinet containing firearms in plain view. Rentschler did not see "blood or anything like that" from outside the house.

¶ 10    Rentschler testified that he and several other officers entered through the east door on the north side of the house, which led into the kitchen. Rentschler saw food and plates piled on countertops and a rug partly rolled up. There were no signs of a struggle. The officers proceeded to the living room. Up to this point, they had not called for an ambulance.

¶ 11    On cross-examination, Rentschler testified that, after failing to make contact from the outside with anyone inside the house, he became concerned because of the time of night, the volume of the music (windowpanes were shaking), the lights being on, and one door being ajar. The neighbor who called in the complaint told Rentschler that defendant had a drug problem and a "drug conviction," the latter of which Rentschler confirmed by a computer search. He and Kuttner tried unsuccessfully to contact defendant and family members by phone. Rentschler knocked on doors for more than an hour. The dog continued to bark, but there was no movement inside the house.

¶ 12    Rentschler testified on redirect examination that, before entering the house, he saw no drug paraphernalia or other signs of drug use inside.

¶ 13 Kuttner testified as follows. He was the shift supervisor on the early morning of April 27, 2022. About half an hour after Rentschler was dispatched, Kuttner met him and they walked the property perimeter together. Looking in from the west and north sides, Kuttner saw nobody in the house and no signs of a struggle. The two exterior doors on the north side were shut but unlocked; the interior door, behind the glass exterior door, was ajar. At some point, Kuttner went to the south door, looked in, and saw no signs of a struggle. He could not confirm that anyone was home.

¶ 14 Kuttner testified that he and Rentschler spoke with Bob Heitzman, who had made the noise complaint. Heitzman, a former police commander, said he lived across the street from the house. Heitzman did not say he saw anyone in the house before he called, but he did say he believed that "because the vehicle was there[,] *** defendant was in the house."

¶ 15 Kuttner testified that the officers entered the house at 3:47 a.m., 1 hour and 16 minutes after Rentschler arrived on the scene. During that period, Kuttner never requested that an ambulance be dispatched to the scene. At some point, he called a superior officer and told him that extremely loud music was coming from the house, firearms inside were in plain view, and the officers could make no contact with anyone by phone or by pounding on the door.

¶ 16 Kuttner testified that, before the entry, he did not call the state's attorney's office or have anyone prepare an application for a search warrant. Asked whether "anything as far as the situation in the residence" changed between 2:31 a.m. and 3:47 a.m., Kuttner said no. After three or four more officers arrived, all the officers entered the house through the east door on the north side. Kuttner led the way, carrying a ballistic shield. He had not received any information that "anybody was hurt in there or that there was an emergency."

¶ 17 On cross-examination, Kuttner testified that Heitzman said that defendant moved into the house about the time his father died. Among Kuttner's concerns before entering the house were

the extremely loud music, the dog barking, the failure to get a response from inside the house, the vehicle in the driveway, and the ajar door. After the entry, the police gathered no evidence but called for an ambulance. Later, they obtained a search warrant and gathered evidence in the house.

¶ 18    On redirect examination, Kuttner acknowledged that, upon seeing the firearms, he could have secured the scene with additional officers and possibly obtained a search warrant.

¶ 19    After defendant rested, the State called Rentschler. He testified that he did not recall how many vehicles were parked in the driveway. Heitzman told him that he believed that defendant was home, because he saw defendant's vehicle in the driveway. Heitzman did not say why he thought that the vehicle belonged to defendant. Heitzman said that he had known defendant since the latter was a child. When Rentschler was asked whether he believed, before entering the house, that "someone would be in the residence under duress or in need of medical attention," he testified, "Yes. I thought that was possible." When Rentschler entered the house, he located defendant. Rentschler did not collect any evidence upon the initial entry.

¶ 20    The parties rested. After hearing arguments, the trial court granted defendant's motion, reasoning in part:

> "Officers *** made entry into the residence at 3:47 a.m. without a search warrant where they found the defendant. At the time, the officers made entry into the residence, approximately one and a quarter hours had passed from Officer Rentschler's initial arrival to investigate the noise complaint. Officers observed no activity inside the residence other than hearing the extremely loud music and the barking dog.
>
> The observation of the long guns located inside of the residence in a gun cabinet, the Court finds, is not under these circumstances an exigent circumstance that would justify a warrantless entry into the residence. The Court also finds, then, the totality of the

information known to the officers at the time of their warrantless entry into the residence does not establish reasonable grounds for the officers to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life or property."

¶ 21    The State moved to reconsider. It argued that—based on the extremely loud music, the absence of any response to the officers' repeated pounding on the doors, and the vehicle in the driveway that led Heitzman to believe defendant was probably home—the officers had reasonable grounds to believe that defendant was inside and needed immediate assistance.

¶ 22    In denying the motion to reconsider, the trial court explained that the officers' actions were initiated by a noise complaint, which, in itself, provided no basis to suspect an emergency. The court noted further that, other than Heitzman's inference from the vehicle's presence in the driveway, the officers had no reason to believe that defendant was inside the house. They had seen nobody inside the house, even though most of the first floor was illuminated. Thus, all the officers observed before entering was "incredibly loud music coming out of the residence with no sign that another individual [was] inside." The court continued:

"It is possible there was an individual in the residence who did not want to answer the door, as a resident has the right to do. It is possible at that point there was no individual in the residence. *** [I]t is possible that there may have been an individual in duress of some sort in the residence but this [c]ourt does not find that the information available to the officers *** outside the residence was sufficient to suggest that that was the likely possibility such that would justify based upon exigent circumstances a warrantless entry into the residence."

¶ 23    This timely appeal followed.

¶ 24                                II. ANALYSIS

¶ 25 On appeal, the State contends that the trial court erred in holding that the warrantless entry into defendant's residence failed to satisfy the emergency exception to the fourth amendment's warrant requirement. For the following reasons, we reverse.

¶ 26 In reviewing a ruling on a motion to suppress, we give great deference to the trial court's findings of fact, which we shall not disturb unless they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review *de novo* the trial court's ultimate legal ruling on whether suppression is warranted. *Id.* at 542-43.

¶ 27 The fourth amendment does not prohibit police officers from entering a home without a warrant if exigent or compelling circumstances justify the entry. *People v. Foskey*, 136 Ill. 2d 66, 74-75 (1990). The State bears the burden of demonstrating exigent need. *Id.* at 75. Exigency exists when, for example, " 'police enter into and search the premises with a reasonable belief that immediate action is necessary for the purpose of providing aid to persons or property in need thereof.' " *People v. Ferral*, 397 Ill. App. 3d 697, 704 (2009) (quoting *People v. Griffin*, 158 Ill. App. 3d 46, 50 (1987)). Under this "emergency exception" to the warrant requirement,

> "(1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance in the protection of life or property; and (2) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be entered and searched." *Id.* at 705.

The reasonableness of an officer's belief as to the existence of an emergency is determined by the entirety of the circumstances known to the officer at the time of the entry. *Id.*

¶ 28 Here, defendant does not contend that, *if* the police had reasonable grounds to believe that there was an emergency, they lacked a reasonable basis, akin to probable cause, to associate defendant's house with the emergency. The trial court found no basis to doubt that, if the first

prong were satisfied of the emergency exception, the second prong would be satisfied also. Therefore, on appeal, only the first prong is at issue. We proceed accordingly.

¶ 29    The trial court reasoned that, although the police believed that someone was in the house needing immediate assistance, it was equally likely that (1) no one was in the house or (2) someone *was* inside but was exercising the right not to answer the door(s). The court found several considerations that weighed strongly against a reasonable belief in an emergency. First, Heitzman's call, which initiated the police activity, was about excessive noise, which, by itself, presented no emergency. Second, only Heitzman's somewhat guarded statement gave the officers a basis to believe that the vehicle in the driveway meant that defendant was home. Third, the officers looked into the house and saw no one there, although most of the first floor was illuminated and visible. Also, while the court did not mention it, the officers saw no signs of a struggle.

¶ 30    The State argues first that the officers had reasonable grounds to believe that defendant was home, given that (1) Heitzman said defendant lived there and recognized his vehicle in the driveway, (2) the lights were on, (3) extremely loud music was playing, and (4) the east door on the north side was ajar. The State argues second that the officers had reasonable grounds to believe that defendant needed immediate assistance, as (1) nobody responded to the repeated banging on the doors, (2) phone calls to defendant received no response, and (3) defendant used drugs and had a "drug conviction."

¶ 31    Defendant argues in part that the police lacked reasonable grounds to believe that anyone was inside the house, given that, before entering, they had seen nobody inside and received no response to their pounding on the doors. Defendant also argues that the police lacked reasonable grounds to believe that, *if* he were home, he needed immediate assistance. He notes that there were no signs of a struggle and no report of anyone in distress.

¶ 32 We note one argument by defendant that requires extended discussion at this point. Defendant relies on the long delay between the arrival of the police and their entry into the house to cast doubt on whether the officers believed there was an emergency. He reasons that the police would not have spent so much time attempting to get a response from someone they *actually believed* needed *immediate* assistance. Defendant's factual inference as to the officers' state of mind—an inference that the trial court might have drawn yet did not explicitly rely on—is not without force. Nonetheless, defendant's reliance on the delay as negating reasonable grounds is contrary to the law.

¶ 33 We acknowledge that some appellate court cases have taken the approach defendant advocates. In *People v. Koester*, 341 Ill. App. 3d 870, 875 (2003), this court stated that "the officers' purported belief that an emergency *** existed in the home [was] belied by the record," as they waited half an hour to enter, "plac[ing] doubt on the officers' testimony that they believed an emergency *** existed." See also *People v. Borders*, 2020 IL App (2d) 180324, ¶ 40 (citing *Koester*, 341 Ill. App. 3d at 872-74); *People v. Paudel*, 244 Ill. App. 3d 931, 941 (1993); *People v. Bondi*, 130 Ill. App. 3d 536, 539 (1984).

¶ 34 Other decisions have held that an officer's subjective belief in the existence of an emergency is legally irrelevant to the validity of the search. In *People v. Lewis*, 363 Ill. App. 3d 516, 523 (2006), we said, "scrutiny of an emergency-assistance search should be based on the objective circumstances of the situation, not on the subjective motives of the officers involved." However, we acknowledged that, at the time of our opinion, "[t]he proper resolution of [the] issue [was] not clearly dictated by binding precedent." *Id.* at 525.

¶ 35 But soon after we issued *Lewis*, the United States Supreme Court resolved the issue. In *Brigham City v. Stuart*, 547 U.S. 398 (2006), the Utah Supreme Court held that the police officers'

warrantless entry into a home did not fit within the emergency exception, in part because the officers had not sought to assist an injured person inside but instead had acted " 'exclusively in their law enforcement capacity.' " *Id.* at 401-02 (quoting *Brigham City v. Stuart*, 2005 UT 13, ¶ 26, 122 P.3d 506). The Court reversed, holding that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " (Emphasis in original.) *Id.* at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). In *Michigan v. Fisher*, 558 U.S. 45, 46-47, 50 (2009) (*per curiam*), the Court reversed a suppression order, ruling that the state court erred in holding that the emergency exception was inapplicable because the officer failed to summon medical help for the injured defendant. The Court reasoned:

> "[E]ven if the failure to summon medical personnel conclusively established that [the officer] did not subjectively believe, when he entered the house, that [the defendant] or someone else was seriously injured ***, the test, *** is not what [the officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger [citation]." *Id.* at 49 (quoting *Stuart*, 547 U.S. at 406).

¶ 36 Our state supreme court, which follows a "limited lockstep approach" on fourth amendment jurisprudence (*Ferral*, 397 Ill. App. 3d at 705 n.5), has adopted the reasoning of *Stuart* and *Fisher* for purposes of our state constitution's restrictions on searches and seizures (see Ill. Const. 1970, art. I, § 6). See *People v. Aljohani*, 2022 IL 127037, ¶¶ 42-43; *People v. Wear*, 229 Ill. 2d 545, 566 (2008), *abrogated in part on other grounds by Lange v. California*, 594 U.S. 295, 300 (2021). Therefore, insofar as defendant relies on the officers' delay to argue that they did not really believe that there was an emergency, the argument is legally irrelevant.

¶ 37      In denying the State's motion to reconsider, the trial court explained that three things were "possible": (1) someone was inside the home but chose not to respond, (2) no one was inside, and (3) someone needing immediate assistance was inside. Only the third possibility would justify the entry. The court concluded, however, that the officers' knowledge was not "sufficient to suggest that [this] was *the likely possibility* such that would justify" the warrantless entry. (Emphasis added.)

¶ 38      The trial court made an error of law. The first prong of the emergency exception requires the police to have reasonable grounds to believe that an emergency is at hand. *Ferral*, 397 Ill. App. 3d at 705. Our supreme court "has equated the 'reasonable grounds' standard with the probable cause standard applied in the context of search and seizure under the fourth amendment." *People v. Gocmen*, 2018 IL 122388, ¶ 19. By requiring that an emergency be *the* likely possibility, the trial court assumed that "probable cause" means "more likely than not." However, "[p]robable cause *** 'does not demand any showing that such a belief be correct *or more likely true than false*.' " (Emphasis added.) *People v. Jones*, 215 Ill. 2d 261, 277 (2005) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)). We turn to whether the facts known to the officers at the time, as found by the trial court, met the proper legal standard.

¶ 39      We address first the known facts relevant to whether someone was inside the home when the police entered. Although the officers did not see anybody inside the house, they could not view the entire residence, or even the entire first floor. Their attempts to call defendant were unavailing, but this could have resulted from the very type of emergency that would have justified the entry. Defendant's inaction could have been due to unconsciousness or some other serious impairment. Also, Heitzman, defendant's longtime acquaintance and neighbor, believed with reason that defendant was home, given that defendant's car was parked in the driveway. Further, it is common

knowledge that people are usually home between 1 and 4 a.m., and it is especially unlikely that someone would be somewhere else at that time without having driven there. The officers could also infer from the continuous extremely loud music that defendant would have turned it off had he gone elsewhere, unless he was grossly inattentive or simply malicious toward his neighbors. Finally, the east door on the north side was slightly ajar, more suggestive of defendant being at home, or someone else having entered recently, than of defendant having left for elsewhere. These facts strongly militated in favor of a conclusion that defendant was home at the time. They were not conclusive, of course, but such a level of proof was not needed.

¶ 40 We turn to the known facts pertinent to whether defendant or another person (likely, the former) needed immediate assistance. These facts conflict. On the one hand, the noise complaint and the noise itself were not probative of an emergency. Moreover, the officers had no other specific information about an emergency.

¶ 41 Conversely, the evidence of what did *not* happen heavily favored finding an emergency. After 1 hour and 16 minutes, the officers received no response from anyone inside (other than a canine). They could reasonably conjecture that the silence resulted not from the occupant's unwillingness to respond but from his inability to do so. Heitzman told Rentschler and Kuttner that defendant was a problem drug user, which was corroborated by defendant's drug conviction (although we do not know the specific offense). And, although the officers eventually found defendant asleep, a reasonable officer would have considered this possibility remote, given the extremely loud music and the officers' chorus of knocks on multiple doors.

¶ 42 The long delay between the officers' arrival and entry is the most complicated factor. As noted, *Stuart*, *Wear*, and *Aljohani* dictate that, in the reasonable-grounds analysis, we may not consider the officers' subjective belief or unbelief in the existence of an emergency. See *Stuart*,

547 U.S. at 404; *Aljohani*, 2022 IL 127037, ¶¶ 42-43; *Wear*, 229 Ill. 2d at 566. Nonetheless, in *Aljohani*, a murder case, our supreme court implied that delay may still be probative of the existence of an emergency. There, the defendant argued that the officers' delay of about 15 or 20 minutes between their arrival and their warrantless entry into his apartment established that there was no emergency. *Aljohani*, 2022 IL 127037, ¶ 55. The court disagreed, reasoning that "the passage of time is but *one fact to consider*" and that the officers used the time to gather more evidence to justify the entry. (Emphasis added.) *Id.* Thus, although the delay did not invalidate the entry, it was not *per se* irrelevant.

¶ 43   We note that the delay in *Aljohani* was much shorter than the one here and that there was little evidence-gathering after Rentschler and Kuttner spoke with Heitzman. Nonetheless, the police used the extended period afterward to ascertain whether defendant would answer the door. Whatever doubt the delay cast on the officers' subjective motivations, the objective circumstances at the time of the entry made the existence of an emergency a very reasonable conjecture. In all, the evidence of whether defendant or someone else in the house needed immediate assistance was in equipoise.

¶ 44   Under the emergency exception to the warrant requirement, the officers' entry was valid if the facts known to them established reasonable grounds to believe both that (1) somebody was inside the house *and* (2) the person needed immediate assistance. That threshold was met. Therefore, the suppression order must be reversed.

¶ 45   In addition to citing cases for the various legal propositions we apply in our analysis, the parties discuss several cases that purportedly are (or are not) factually on point. See, *e.g.*, *People v. Kolesnikov*, 2022 IL App (2d) 180787-B-U, ¶ 29 (emergency existed based on a suicide threat sent from the defendant's e-mail account, together with his appearance and behavior when the

police responded to his home). Generally, the resolution of fourth amendment cases is highly fact-specific (see *People v. Flores*, 371 Ill. App. 3d 212, 222 (2007)), and never more so than here. The parties' cases are too factually dissimilar to be helpful, and we do not discuss them.

¶ 46                                    III. CONCLUSION

¶ 47    For the reasons stated, we reverse the interlocutory order of the circuit court of Kane County.

¶ 48    Reversed.

---

### *People v. Cummins*, **2025 IL App (2d) 230516**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 22-CF-765; the Hon. Julia A. Yetter, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Randy K. Johnson, of West Dundee, and J. Brick Van Der Snick, of Van Der Snick Law Firm, Ltd., of St. Charles, for appellee. |

---