# Illinois Official Reports

## Appellate Court

> ## *People v. Kulpin*, 2021 IL App (2d) 180696

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL KULPIN, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0696 |
| Filed | February 8, 2021 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 16-CF-401; the Hon. Robbin J. Stuckert, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Bridges and Justice Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant, Michael Kulpin, appeals his convictions of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and concealment of a homicidal death (720 ILCS 5/9-3.4 (West 2016)), following a bench trial. He was sentenced to an aggregate term of 63 years' imprisonment. He challenges the denial of his suppression motion and argues on various grounds that his sentence is invalid. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3     On June 24, 2016, a De Kalb County grand jury charged defendant by superseding indictment with two counts of first degree murder, aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)), and concealment of a homicidal death. The victim was 19-year-old Moorea Des Roches. Defendant and Moorea were living together at 906 Kimberly Drive, Apartment 1, in the city of De Kalb when the police discovered her body inside defendant's bedroom closet on June 5, 2016. An autopsy revealed that Moorea was stabbed and bludgeoned multiple times.

¶ 4                              A. The Motion to Suppress Evidence

¶ 5     Prior to trial, defendant moved to suppress evidence that the police seized from his apartment during a warrantless search. The following testimony was introduced at the February 15, 2018, hearing on the motion to suppress.

¶ 6                                1. *Officer Jonathan Jursich*

¶ 7     On Sunday, June 5, 2016, at 8:40 p.m., Jonathan Jursich, a De Kalb police officer, was dispatched to Apartment 1 at 906 Kimberly Drive in reference to a missing person report. The dispatcher advised Jursich that Susan Des Roches was attempting to contact her daughter, Moorea, as she had not seen or spoken with Moorea since the previous Friday.

¶ 8     Jursich did not locate Moorea's car in the apartment building's parking lot. He looked in the apartment's windows but saw no one present. No one answered his knock at the apartment's door. He returned to the police department and contacted Susan.

¶ 9     Susan told Jursich the following. Susan had custody of Moorea and defendant's infant child. However, Susan allowed Moorea to keep the child the previous Friday night. Moorea was supposed to return the child to Susan on Saturday. On Saturday morning, Susan received a text sent from defendant's phone. Susan said that Moorea and defendant shared the same phone. The text said that Moorea was dropping off the child because she was called into work early. However, defendant brought the child to Susan, which was unusual, because Susan did not get along with defendant.

¶ 10    Susan described Moorea's relationship with defendant as marred by domestic violence and physical abuse. Susan told Jursich that defendant had been arrested for domestic violence against Moorea. When Susan asked defendant why Moorea was not dropping off the child, defendant said that Moorea had been called into work early. Susan texted Moorea throughout Saturday about the child. Some of the texts that Susan received in response, which were purportedly from Moorea, referred to the child as "Bub." Susan said that defendant was the only person who called the child "Bub."

¶ 11    Susan further told Jursich that, later Saturday afternoon, she received a call from Moorea's supervisor at Portillo's Restaurant in Batavia. The supervisor was worried because Moorea had not shown up for work. On Sunday, Susan went to defendant and Moorea's apartment, looking for Moorea. Susan did not find either Moorea or her car. When Moorea's supervisor informed Susan that Moorea did not come into work on Sunday either, Susan called the police. After she made that call to the police, Susan spoke on the phone with defendant, who said that Moorea had again been called into work early. Defendant then hung up on Susan.

¶ 12    Jursich testified that—after speaking with Susan—he, Sergeant Todd Wells, and Sergeant Mark Tehan decided to return to defendant's apartment. They arrived there at 10:07 p.m. Upon arrival, Jursich located Moorea's car in the parking lot. Jursich knocked on the apartment door and heard movement from inside the apartment. He went outside and looked through the windows, but he did not see anything. Jursich returned to the apartment door. Eventually, defendant opened the door, and Jursich informed him that the officers were making a well-being check on Moorea. Jursich asked defendant to step outside the apartment into the hallway. Jursich testified that, in his opinion, defendant was under the influence of drugs. According to Jursich, defendant had difficulty standing. Meanwhile, Tehan was speaking with another male, later identified as Michael Meszaros. Jursich saw Meszaros inside defendant's apartment when defendant opened the door to the officers.

¶ 13    Defendant told Jursich that he had taken Moorea to work that morning in an Uber. Jursich informed defendant that Moorea had not been at work that day. Defendant repeated that he had dropped Moorea off at work that morning. Defendant added that he used the Uber to go to a job interview. Defendant stated that he was "recently" in the company of Meszaros and Meszaros's girlfriend, Kaileigh Jung-Herman. Jursich asked defendant if Moorea was in the apartment, and defendant said no. Jursich then asked defendant if he, Meszaros, and Jung-Herman had been the only persons in his apartment. Defendant stated that he was "not sure." When Jursich asked defendant how he could not be sure who was in his apartment, defendant repeated that Moorea was not there. Jursich then told defendant that the most important thing to Jursich was to find Moorea. Defendant stated that he wanted Jursich to find Moorea. Jursich then told defendant that the police needed to make sure that Moorea was not in the apartment. Wells offered to search only in places where a human could be located.

¶ 14    Then, defendant stated: "There's something in the closet that will put me in jail for a very long time." Jursich asked what that was, and defendant answered that there were "marijuana and a crack pipe in the apartment." Jursich asked defendant for permission to search the apartment. Defendant refused to give permission.

¶ 15    According to Jursich, defendant admitted to having used crack and marijuana that day. When defendant complained of feeling sick, Jursich escorted him outside the apartment building to dry heave. When they returned to the hallway, Officer Elizabeth Fabro was present. Fabro stayed with defendant while Jursich conferred with Tehan and Wells. Jursich, Tehan, and Wells then decided to enter defendant's apartment without a warrant, to conduct a well-being check on Moorea. Jursich checked the living room and the bathroom. He testified that they were looking only in "areas big enough to where a human could fit in."

¶ 16                              *2. Officer Elizabeth Fabro*

¶ 17    Fabro responded as Jursich's backup to the 8:40 p.m. dispatch to defendant's apartment. She testified that she did not see Moorea's car in the parking lot and that no one answered

- 3 -

defendant's door when the officers knocked. She looked in defendant's apartment windows. There was a light on, and she saw a comforter on the bedroom floor. She saw no evidence of criminal activity or signs that anyone needed help, so she left.

¶ 18    At trial,[1] Fabro testified that she switched to bike patrol after 9 p.m. Later, Jursich needed an additional unit at defendant's apartment building, so she "pedaled" there at about 10:24 p.m. Fabro testified that she met up with the other officers inside defendant's apartment building at 10:46 p.m. Jursich asked Fabro to stand with defendant while Jursich conferred with Tehan and Wells. Fabro noted that defendant did not "look well." Fabro testified that defendant's head was "bobbing back" and his eyes were "kind of rolling." She stated that defendant "looked very tired" and his eyes would "roll back." Defendant told Fabro that he had been "doing drugs," including heroin, all day. Fabro stayed with defendant until Jursich placed him in handcuffs.

¶ 19                                      3. *Sergeant Mark Tehan*

¶ 20    On June 5, 2016, Tehan arrived at defendant's apartment building at 9:55 p.m. Jursich and Wells were already there. Tehan announced that they were with the De Kalb Police Department as he knocked on defendant's door. Several minutes later, defendant opened the door. While Jursich and Wells spoke with defendant, Tehan spoke with Meszaros and Jung-Herman. Both individuals denied having seen Moorea.

¶ 21    Wells told Tehan that he was working with the police department's drug investigation team to obtain a search warrant for defendant's apartment. According to Tehan, "based on everything we had been told," including that Moorea was not then at work because the restaurant was closed, the officers decided to enter defendant's apartment immediately to "locate Moorea." Tehan testified that their purpose was to "locate Moorea and provide medical aid if needed."

¶ 22    Tehan checked the kitchen and the back bedroom. He was "looking in spots big enough to hold a person." The door to the back bedroom was closed. Tehan opened it. Inside the room, he saw a crib. Tehan testified that there was a closet with a closed door. He opened the closet door. Tehan testified: "I saw a body-shaped bundle on the floor of the closet. It was wrapped in a shower curtain over a blanket." Tehan peeled back the wrappings and saw Moorea. She was deceased.

¶ 23                                      4. *Sergeant Todd Wells*

¶ 24    On June 5, 2016, at 9:55 p.m., Wells responded to a missing person report at defendant's apartment. Prior to his arrival, Wells spoke with Jursich. Jursich told Wells about his conversation with Susan. Wells was also independently aware of prior "domestic disputes" between defendant and Moorea, which raised his concerns about Moorea's well-being. Wells spoke with the occupant of the apartment directly across the hall from defendant's apartment.

---

[1]For convenience, we combine Fabro's testimony at the hearing on the motion to suppress with her trial testimony because they both relate to issues defendant raises regarding the warrantless search of his apartment. In reviewing the trial court's ruling on a motion to suppress evidence, it is proper for us to consider the testimony adduced at trial as well as at the suppression hearing. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 41.

She told Wells that she had not seen Moorea "recently." Wells knew that Moorea's car was in the apartment building's parking lot.

¶ 25 Then, Wells and Jursich spoke with defendant. Because defendant's eyes kept rolling to the back of his head, Wells concluded that defendant was under the influence of drugs. Defendant told the officers that he dropped Moorea off at work that morning. Defendant stated that later he was in his apartment with Meszaros and Jung-Herman. According to Wells, defendant first stated that he was "not sure" if he, Meszaros, and Jung-Herman were the only persons inside his apartment, but then defendant stated that there was no one else present. When the officers stressed that their "most important" concern was to find Moorea, defendant gave them "limited" consent to search his apartment. According to Wells, defendant gave them permission to "look into the rooms." Wells then told defendant that they wanted "to look in all areas that a person may be." Defendant said that there was something in his closet that was "going to put him in jail for a very long time." Defendant stated that he had cannabis and a crack pipe. Wells asked defendant for permission to search his apartment. Wells advised defendant that, if he refused permission, the police would obtain a warrant. Defendant told Wells to get a warrant.

¶ 26 Next, Wells conferred with Tehan. Wells testified that he had decided to pursue a drug investigation. To that end, Wells requested the police department's drug investigation unit to procure a search warrant for defendant's apartment. Wells testified that it would take a minimum of two hours to get the warrant, during which time the police would secure defendant's apartment, meaning that no one would be allowed to enter it.

¶ 27 Wells testified that, at the same time, nothing had alleviated his concern for Moorea's well-being, which was the reason for the police response in the first place. Wells considered the drug investigation as separate from their primary purpose of determining Moorea's well-being. Based on everything that he knew, Wells believed that there was "a very good chance" that Moorea was in the apartment. Consequently, Wells testified that he, Jursich, and Tehan entered defendant's apartment. According to Wells, waiting two hours for a warrant would be too long if Moorea were in distress.

¶ 28 ### 5. *The Court's Ruling on the Motion to Suppress Evidence*

¶ 29 The court took the matter under advisement. On March 28, 2018, the court issued its oral ruling. The court first recounted the facts. Next, the court made findings. The court found that Moorea was missing under suspicious circumstances. The court found that the police officers credibly testified that defendant was under the influence of drugs, based on defendant's demeanor and his admissions that he had ingested drugs and had drugs in his apartment. The court found that the officers could reasonably infer that Moorea was in the apartment, perhaps overdosing on drugs, and that she would need police assistance. The court based that finding on Moorea's automobile being in the parking lot, defendant's statement that he was not sure how many people were in the apartment, and defendant's demeanor and appearance. The court found that, after the officers entered the apartment, their intent was to locate Moorea, as they confined their search to places where a human could be found, rather than prying into hidden places to look for contraband. Lastly, the court found that the officers immediately left the premises after they discovered Moorea's body. Therefore, the court concluded, the officers had

a reasonable belief that an emergency existed. The court denied the motion to suppress.[2]

¶ 30                                    B. The Trial

¶ 31        On April 16, 17, and 18, 2018, the parties proceeded to a bench trial. Jursich, Fabro, Tehan, and Wells testified consistently with their testimony at the hearing on the motion to suppress evidence. In addition, the State presented the following testimony. Susan testified as a life-and-death witness. Jung-Herman testified that, on June 5, 2016, she, Meszaros, and defendant went together to Chicago to purchase heroin. After consuming some of the heroin, they went to defendant's apartment to shoot more heroin. Moorea was not present. Defendant instructed Jung-Herman and Meszaros not to go into his bedroom. When the police knocked and announced, "This is the police," defendant went into his bedroom. Jung-Herman heard "shuffling" noises coming from the bedroom. Meszaros testified that defendant told them that he had not seen Moorea since he dropped her off at work that morning. Meszaros also testified that defendant instructed them not to go into his bedroom. When the police were knocking on the door, Meszaros tried to follow defendant into his bedroom, but defendant blocked the bedroom door.

¶ 32        Denise Gombar testified to a March 17, 2015, incident in which Gombar witnessed defendant beating Moorea with his fists while defendant and Moorea were riding in the back seat of Gombar's car.

¶ 33        After the police found Moorea's body, they obtained a warrant to search defendant's premises. During that search, the police recovered from a dumpster in the parking lot of defendant's apartment building a broken metal pot, a bottle of bleach, bloody clothes, and a bloody towel. DNA linked those items to defendant and Moorea. Inside defendant's apartment, the police discovered blood stains, bloody items, and various cleaning products. An autopsy established that the cause of Moorea's death was multiple sharp-force and blunt-force injuries.

¶ 34        The State introduced a video recording of defendant's interrogation, in which he admitted stabbing Moorea and hitting her with a frying pan during a verbal and physical altercation, which resulted in her death.

¶ 35        The court found defendant guilty on all four counts of the superseding indictment. The court merged the two first degree murder count and then merged the aggravated-domestic-battery count into the remaining first degree murder count. The court sentenced defendant to 60 years' imprisonment on the first degree murder conviction and a consecutive 3-year term on the concealment of a homicidal death conviction. Defendant filed a motion to reconsider the sentence. The motion was denied, and defendant filed a timely appeal.

¶ 36                                    II. ANALYSIS
¶ 37                           A. The Motion to Suppress Evidence
¶ 38        Defendant first contends that the court erred in denying his motion to suppress evidence. It is undisputed that the police officers neither had a warrant nor consent to search when they entered defendant's apartment. The State argues that the intrusion was made pursuant to the

_____

[2]The trial court did not rule on the State's alternative argument that Moorea's body would have been legally discovered if the officers obtained a search warrant. The court also denied defendant's motion to suppress his confession, which is not at issue in this appeal.

emergency-assistance exception to the warrant requirement. In the alternative, the State asserts that Moorea's body would have been legally discovered if the officers obtained a search warrant. Defendant asserts that the emergency-assistance exception does not apply because the officers delayed their entry for almost one hour after they returned to defendant's apartment the second time. Citing *People v. Carter*, 2016 IL App (3d) 140958, ¶ 33 (police who believe that they have probable cause to search cannot enter without a warrant on the rationale that they intended to obtain a warrant), defendant also contends that the inevitable-discovery rule does not apply, because the police could not justify their warrantless search by claiming that they planned to obtain a warrant.

¶ 39    In reviewing a ruling on a motion to suppress, this court accepts the trial court's findings of fact so long as those findings are not against the manifest weight of the evidence. *People v. Lewis*, 363 Ill. App. 3d 516, 523 (2006). However, we review *de novo* the trial court's ultimate ruling on the legality of the search or seizure. *Lewis*, 363 Ill. App. 3d at 523.

¶ 40    The fourth amendment to the United States Constitution protects persons from unreasonable searches and seizures. U.S. Const., amend. IV. Similarly, article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) protects persons against unreasonable searches and seizures and is interpreted in lockstep with the fourth amendment. *People v. Ferral*, 397 Ill. App. 3d 697, 704 (2009). The chief evil against which the fourth amendment is directed is entry into the home. *People v. Swanson*, 2016 IL App (2d) 150340, ¶ 26. It is a basic principle of fourth amendment law that searches and seizures inside a dwelling without a warrant are presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Because the "touchstone" of the fourth amendment is "reasonableness," the warrant requirement is subject to exceptions, including the need to protect or preserve life. *Stuart*, 547 U.S. at 403. "[P]reservation of human life is paramount to the right of privacy protected by the fourth amendment." *State v. Bogess*, 340 N.W.2d 516, 521 (Wis. 1983). Consequently, law officers may enter a home without a warrant to give emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Stuart*, 547 U.S. at 403. "[T]he right of the police to enter and investigate in an emergency is inherent in the very nature of their duties as police officers *** and derives from the common law ***." *People v. Smith*, 47 Ill. 2d 161, 165 (1970).

¶ 41    In *Lewis*, this court held that an emergency-assistance search is valid where (1) there are reasonable grounds to believe that there is an emergency that requires the intrusion and (2) there is a reasonable basis, approximating probable cause, to associate the emergency with the area searched. *Lewis*, 363 Ill. App. 3d at 530. Here, defendant conceded the existence of the second prong at the hearing on the motion to suppress. Thus, the question is whether the De Kalb officers had reasonable grounds to believe that an emergency required their intrusion into defendant's apartment before obtaining a search warrant. In *Lewis*, this court explained that the "controlling criterion is one of reasonableness." *Lewis*, 363 Ill. App. 3d at 529 (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (warrantless searches and seizures are permitted where the police "reasonably believe that a person within is in need of immediate aid")). The reasonableness of an officer's belief that an emergency exists is determined by the "*entirety of the circumstances known to the officer at the time of entry*." (Emphasis added.) *Ferral*, 397 Ill. App. 3d at 705.

¶ 42    On appeal, defendant does not challenge the trial court's findings of historical fact. Rather, defendant urges that those facts presented no emergency. Specifically, defendant asserts that

so much time elapsed between the officers' second arrival at defendant's apartment and their entry that no emergency existed. Jursich testified that the officers arrived at defendant's apartment building for the second time at 10:07 p.m. Tehan and Wells testified that they either went to defendant's building, or arrived there, at approximately 9:55 p.m. Defendant notes that the record does not indicate the time when the officers entered defendant's apartment to search for Moorea. However, defendant posits that it was after Fabro arrived at 10:46 p.m., because she stayed outside the apartment with defendant while the others entered to conduct the search.

¶ 43    Defendant argues that, once officers arrive at a scene, the emergency-assistance exception "requires a quick response from officers." According to defendant, waiting even 10 minutes to enter the premises to search "undermines the purpose of the emergency-aid exception because in that time, the emergency could pass." Defendant relies on *People v. Lomax*, 2012 IL App (1st) 103016. *Lomax* involved multiple 911 calls from citizens claiming that gunshots had been heard from a specific address. *Lomax*, 2012 IL App (1st) 103016, ¶ 5. The appellate court in *Lomax* upheld the police officers' entry into the defendant's apartment, holding that the 911 calls triggered the emergency-assistance exception to the warrant requirement. *Lomax*, 2012 IL App (1st) 103016, ¶ 47.

¶ 44    However, the *Lomax* court distinguished *People v. Feddor*, 355 Ill. App. 3d 325 (2005), where the police were investigating a traffic accident in which the defendant had fled the scene. Officers arrived at the defendant's home, rang the doorbell, and received no answer, and they then waited 10 minutes for another officer to arrive before they forcibly entered the defendant's residence and arrested him for driving under the influence of alcohol. *Lomax*, 2012 IL App (1st) 103016, ¶ 33. The *Lomax* court noted that the *Feddor* court determined that "the facts did not support a reasonable belief that an emergency existed." *Lomax*, 2012 IL App (1st) 103016, ¶ 34.

¶ 45    The facts in *Lomax* and *Feddor*, as well as in the other cases defendant cites, are unlike the present case. Here, the officers responded to a missing person report rather than an emergency in progress, such as a 911 hang-up call (*People v. Koester*, 341 Ill. App. 3d 870, 872 (2003)), the sudden appearance in a police station of a disheveled, disoriented person (*People v. Koniecki*, 135 Ill. App. 3d 394, 395-96 (1985)), the report of the presence of dynamite in a house trailer (*People v. Meddows*, 100 Ill. App. 3d 576, 578 (1981)), or a report of theft of telephone services (*People v. Plante*, 371 Ill. App. 3d 264, 266 (2007)). It was not until the De Kalb officers assimilated all of the information known to each of them through their investigations that they determined the existence of an emergency likely involving a drug overdose. In missing person cases, courts approach "each claim of an extraordinary situation by looking at the totality of the particular circumstances known to the searching officer." *People v. Rogers*, 209 P.3d 977, 995 (Cal. 2009).

¶ 46    The facts in *Rogers* are similar to our facts. In *Rogers*, the San Diego police received a report that Biata Toronczak was missing, and her mother feared that the defendant, who was Biata's paramour, was responsible. *Rogers*, 209 P.3d at 991-92. The defendant was evasive and short when questioned. *Rogers*, 209 P.3d at 992. Detective Carlson received information that the defendant had threatened to lock Biata in the basement storage area of his residence. *Rogers*, 209 P.3d at 992. Carlson delayed investigating that tip for over four hours. *Rogers*, 209 P.3d at 992. Then, Carlson spoke with neighbors, who had not seen Biata in weeks. *Rogers*, 209 P.3d at 992. Carlson also learned that the defendant had sole control over the storage area. *Rogers*, 209 P.3d at 992. When Carlson mentioned to the defendant that he had heard of the

threat the defendant made to Biata and then asked the defendant's permission to check the storage area, the defendant's throat began to throb, and he denied permission. *Rogers*, 209 P.3d at 992-93. Carlson and other officers then broke into the storage area, where they discovered a bloody and macabre crime scene. *Rogers*, 209 P.3d at 993.

¶ 47     The California Supreme Court held that "substantial evidence supports the trial court's determination *** that the circumstances known to Detective Carlson established an objective emergency requiring immediate action." *Rogers*, 209 P.3d at 995. The defendant argued that there was no emergency because, in part, Carlson's delays in investigating the storage area was inconsistent with his belief that an emergency existed. *Rogers*, 209 P.3d at 996. The California Supreme Court held that "it makes no difference that Carlson could perhaps have acted even more quickly" because the "relevant inquiry remains whether, in light of all of the circumstances, there was an objectively urgent need to justify a warrantless entry." *Rogers*, 209 P.3d at 997. The court reasoned that the absence of evidence that Biata was dead, the defendant's lack of concern, the defendant's physical reaction when Carlson mentioned the threat to lock Biata in the storage area, and the defendant's sole control over the storage area "all contributed to Carlson's sense of urgency" about entering the storage area immediately to look for Biata. *Rogers*, 209 P.3d at 996.

¶ 48     The Iowa case of *State v. Carlson*, 548 N.W.2d 138 (Iowa 1996), is also instructive. In *Carlson*, the police received a report that a woman was concerned about her mother, Rita, from whom she had not heard in two days. *Carlson*, 548 N.W.2d at 139. The daughter related that the defendant, who had been abusive to Rita, had given the daughter conflicting stories concerning Rita's whereabouts. *Carlson*, 548 N.W.2d at 139. Police officers knocked at the defendant's residence but received no answer. *Carlson*, 548 N.W.2d at 139. The officers then spoke with the daughter again before they made a forced entry. *Carlson*, 548 N.W.2d at 139. The defendant was in bed, but the police found Rita's dead body in the basement behind the furnace. *Carlson*, 548 N.W.2d at 140. The Iowa Supreme Court upheld the search pursuant to the emergency-assistance exception, holding that the "specific and articulable" facts known to the officers when they entered the defendant's home—Rita was missing for two days, the defendant had a past history of domestic violence toward Rita, the defendant gave contradictory stories concerning Rita's whereabouts, the defendant's car was in the garage, the defendant's dog usually resided in the basement but was roaming the first floor, and the defendant did not respond to the officers' knocks—satisfied an objective test of reasonableness that justified the officers' actions. *Carlson*, 548 N.W.2d at 143. In addition, the court stressed that one thing was not known to the officers when they entered the defendant's home: that Rita was dead. *Carlson*, 548 N.W.2d at 143. Thus, although it seemed highly likely that some terrible harm had befallen Rita, the officers were searching for *her*, not her body. *Carlson*, 548 N.W.2d at 143.

¶ 49     We glean from *Rogers* and *Carlson* that it is not the amount of time that elapses from the first report of a missing person to when the police make a warrantless entry that determines whether an emergency exists but, rather, the totality of the circumstances known to the police when they make the entry. This is consistent with this court's decision in *Ferral*, where we held that the "existence of an emergency is determined by the entirety of the circumstances known to the officer at the time of entry." *Ferral*, 397 Ill. App. 3d at 705.

¶ 50     Here, as in *Rogers* and *Carlson*, it took investigation by the officers to ascertain "specific and articulable" facts that led them to conclude that an emergency was at hand. When Jursich

was dispatched to defendant's apartment building at 8:40 p.m. on Sunday, he was advised only that Susan had not been able to contact Moorea since the previous Friday. Moorea's car was not in the parking lot, and no one answered defendant's door. Neither Jursich nor Fabro noticed anything amiss, so they left.

¶ 51　However, Jursich's concern increased after he spoke with Susan. In that conversation, Susan related that Moorea was missing under suspicious circumstances. Susan also said that defendant was curt with her when she asked him where Moorea was. Additionally, Susan told Jursich that defendant had a history of domestic violence toward Moorea. Jursich, Wells, and Tehan went back to defendant's apartment. This time, Moorea's car was in the parking lot. Defendant did not immediately answer the door. Then, Jursich noticed that defendant was under the influence of drugs, to the point that he was sick in Jursich's presence. Jursich knew that defendant was lying about dropping Moorea off at work. When Jursich and Wells asked defendant if he and his two friends were the only ones in the apartment, defendant said that he was not sure. Then, when the officers asked for permission to look inside for Moorea, defendant blurted that there was something in his closet that could put him in jail for a very long time. Defendant declared that he had a crack pipe and cannabis in his apartment, but he refused permission to search for Moorea. By this time, Wells had learned from the neighbor that Moorea had not been seen recently, and Tehan knew that Portillo's was closed at that time.

¶ 52　Collectively, the officers knew that Moorea was not at work, her car was in the apartment building's parking lot, defendant lied about her whereabouts, and he was not sure how many people were in his apartment. Further, the officers determined that defendant was under the influence of drugs, drugs were present inside the apartment, and defendant had a history of violence toward Moorea. According to Wells, nothing had alleviated his concern for Moorea's well-being. As in *Carlson*, only then did the officers have reason to suspect that Moorea was in danger inside the apartment. Wells testified that Moorea was their primary concern, and so they decided to enter rather than wait for a search warrant.

¶ 53　Defendant argues that the lack of blood or evidence of a fight militates against any emergency. However, because we consider the entirety of the circumstances, the absence of scratches or blood on defendant's person does not negate the presence of an emergency. See *Rogers*, 209 P.3d at 996 (the absence of gunshots or fire, or certain noises or smells, does not defeat the finding of an emergency).

¶ 54　Also, to the extent that defendant suggests that the officers' true motive was to look for drugs, we held in *Lewis* that the scrutiny of an emergency-assistance search is based on the objective circumstances of the situation, not on the subjective motives of the officers involved. *Lewis*, 363 Ill. App. 3d at 523. Several months after this court's decision in *Lewis*, the Supreme Court of the United States held that an action is reasonable under the fourth amendment, "regardless of the individual officer's state of mind," when the circumstances, viewed objectively, justify the action. *Stuart*, 547 U.S. at 404.

¶ 55　Moreover, the record does not support defendant's suggestion. Once inside defendant's apartment, the officers confined their search to places where a human could be located. At oral argument, defendant conceded that the purpose of the search was to locate Moorea. The officers did not seize any contraband. Accordingly, based on the entirety of the circumstances known to the officers when they entered defendant's apartment, we hold that the trial court did not err in finding that the search was constitutional pursuant to the emergency-assistance exception. Because we hold that the search was proper under the emergency-assistance

exception, we do not address the State's alternative argument that the inevitable-discovery rule should apply.

¶ 56　　　　　　　　　　　　B. Defendant's Challenges to His Sentence

¶ 57　　　Defendant next argues that his aggregate 63-year sentence of imprisonment was (1) unconstitutional and (2) excessive.

¶ 58　　　　　　　　　1. *As-Applied Challenge Under the Eighth Amendment*

¶ 59　　　In *Miller v. Alabama*, 567 U.S. 460, 465 (2012), the Supreme Court of the United States held that a mandatory life sentence without parole for those offenders who are under age 18 at the time of their crimes violates the eighth amendment's (U.S. Const., amend. VIII) prohibition on cruel and unusual punishments. Defendant asks this court to extend *Miller* to persons, like himself, who were over 18 when they committed their crimes. Defendant contends that he received a *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 41 (a sentence of a juvenile to over 40 years' imprisonment is a *de facto* life sentence).

¶ 60　　　In *People v. Harris*, 2018 IL 121932, ¶ 61, our supreme court rejected the defendant's *facial* eighth-amendment challenge, declining to expand *Miller* to apply to adults, like defendant, who were 18 years or older when they committed their crimes. The court further held that the defendant had not developed an adequate record in the trial court to support an *as-applied Miller* challenge. *Harris*, 2018 IL 121932, ¶ 45 ("The record must be developed sufficiently to address defendant's claim that *Miller* applies to his particular circumstances."). Defendant concludes that our supreme court "did not foreclose an as-applied challenge brought by defendants over the age of 18."

¶ 61　　　Defendant recognizes two impediments to our review of this issue. First, in *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 47, this court held that *Miller* "simply does not apply" to a sentence imposed on an offender who was at least 18 at the time of his offense. Second, defendant failed to raise this issue before the trial court.

¶ 62　　　We adhere to our decision in *LaPointe*. Here, defendant was 20 years old—within 6 months of turning 21—when he murdered Moorea. While defendant concedes that he "technically" was not a juvenile, we note that, by no stretch can he be considered a juvenile when he committed the murder. Thus, defendant's argument that the trial court was obligated to consider the factors enumerated in *People v. Holman*, 2017 IL 120655, ¶ 46, before imposing a "*de facto* life sentence," is misplaced.[3] Defendant's reliance on *People v. Suggs*, 2020 IL App (2d) 170632, is likewise misplaced. In *Suggs*, this court noted that a qualifying offender under 21 years of age, who committed a first degree murder, is eligible for parole review after serving 20 years of the sentence. *Suggs*, 2020 IL App (2d) 170632, ¶ 34. Specifically, we noted that the *legislature* changed the parole statute. *Suggs*, 2020 IL App (2d) 170632, ¶ 34. We underscore that it is the function of the legislature, not the courts, to declare the public policy

---

[3]In *Holman*, our supreme court enumerated five factors related to a juvenile defendant's youth and its attendant characteristics that trial courts must consider before sentencing a juvenile to a life sentence without parole. *Holman*, 2017 IL 120655, ¶ 46. Here, although the court was not required to make a finding that the murder was indicative of irretrievable depravity, the evidence shows that it was. After committing the brutal murder in the presence of the parties' infant child, defendant entertained friends in his living room while Moorea's body was concealed in his bedroom.

of this state. *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 65 (2011). Consequently, we determine that, if *Miller* is to be extended to persons over age 18, it is the legislature that should make that change. See *Rosen*, 242 Ill. 2d at 65 (if a modification or change in public policy is desired, the legislature, not the judiciary, must be appealed to).

¶ 63 We also reject defendant's argument that the record in the present case is sufficiently developed that we should decide this issue "in the interests of judicial economy." Defendant suggests that the scientific research extant when *Miller* was decided is outdated and that current research indicates that *Miller* should be extended to persons between 18 and 21 years of age. Defendant includes citations to the various studies upon which he relies. The State argues that the trial court was the "most appropriate tribunal" to hear defendant's as-applied constitutional challenge because such a challenge depends on the circumstances and facts particular to an individual defendant.

¶ 64 The State cites *People v. Thompson*, 2015 IL 118151. In *Thompson*, the adult defendant argued that his mandatory life sentence violated the eighth amendment as applied to him, relying on "evolving science." *Thompson*, 2015 IL 118151, ¶ 38. Our supreme court applied the forfeiture rule, holding that an as-applied constitutional challenge cannot be raised for the first time on appeal. *Thompson*, 2015 IL 118151, ¶ 40. We agree with the State that *Thompson* is applicable to our facts. While the record in the instant case contains more information concerning defendant than is contained in the presentence investigation report, the record is devoid of how the "evolved science" upon which defendant relies applies to the circumstances of his case. Our supreme court noted that how the science applies to a particular defendant's circumstances is the "key showing" for an as-applied constitutional challenge. *Thompson*, 2015 IL 118151, ¶ 38. Accordingly, assuming, without deciding, that *Harris* permits an as-applied challenge, we hold that this issue is forfeited.

¶ 65                                        2. *Proportionate Penalties Challenge*

¶ 66 Next, defendant argues that his sentence violates the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. Article I, section 11, contains two limitations on penalties: (1) they must be determined according to the seriousness of the offense and (2) they must be determined with the objective of restoring the defendant to useful citizenship. *People v. Clemons*, 2012 IL 107821, ¶ 37. Here, defendant argues that his aggregate 63-year sentence of incarceration violates the proportionate penalties clause because (1) the "moral sense of the community has evolved regarding defendants" under age 21 and (2) the sentence fails to provide defendant with a "real opportunity to demonstrate growth and maturity or to live a rehabilitated life."

¶ 67 Defendant's first argument is the same as his eighth amendment argument, which depends upon what defendant identifies as "evolving scientific research." As noted, the record does not show how this research applies to defendant's circumstances. Consequently, we deem this argument to be forfeited. See *Harris*, 2018 IL 131932, ¶ 45 (where the defendant is over age 18 at the time of his offenses, *Miller* does not directly apply to his circumstances, thus requiring the record to be developed sufficiently to make a *Miller* claim cognizable); *People v. Figueroa*, 2020 IL App (2d) 160650, ¶ 89 (court declined to address as-applied proportionate penalties challenge where the record was not sufficiently developed).

¶ 68 However, in his motion to reconsider the sentence, defendant argued that the aggregate 63-year sentence would "not afford [defendant] the opportunity for rehabilitation." Thus, liberally

construing his motion, we conclude that defendant preserved this issue, and we will consider it.

¶ 69       At the sentencing hearing, the court and the parties agreed that the sentence for concealing a homicidal death must be consecutive to the sentence for first degree murder. The parties also agreed that, if an extended-term sentence for first degree murder applied, the range of that sentence would be 20 to 100 years. The court found that defendant was eligible for extended-term sentencing based on defendant's prior convictions of domestic battery and violation of an order of protection, both of which he committed against Moorea. However, the court declined to impose an extended term. Instead, the court sentenced defendant to the maximum nonextended term of 60 years' incarceration for first degree murder and a consecutive 3-year sentence for concealment of a homicidal death.

¶ 70       At the hearing on defendant's motion to reconsider the sentence, defendant argued that the court failed to consider his mental health issues in mitigation and that his aggregate 63-year sentence was essentially a life sentence that prohibited rehabilitation or restoration to useful citizenship. In denying the motion, the court noted that it considered all of the appropriate factors in aggravation and mitigation at the sentencing hearing. The court also noted that, despite defendant's eligibility for extended-term sentencing, the court did not impose an extended term. The court further noted that, in weighing an appropriate sentence, it considered a psychologist's report indicating that defendant continued to present a danger to society.

¶ 71       On appeal, defendant argues that it is "unconstitutional to completely discount [defendant's] rehabilitative potential at such a young age, where his 63-year sentence fails to provide him with a real opportunity to demonstrate growth and maturity or to live a rehabilitated life after his release, should he survive." Defendant relies on *People v. Gipson*, 2015 IL App (1st) 122451, comparing himself at 20 with the 15-year-old defendant in *Gipson*. In *Gipson*, the defendant shot the victim in the buttocks, causing injury but not death. *Gipson*, 2015 IL App (1st) 122451, ¶ 17. The trial court sentenced the defendant as an adult to 52 years in prison. *Gipson*, 2015 IL App (1st) 122451, ¶ 1. The appellate court held that the statute that required the defendant's automatic transfer to adult court, in conjunction with a statutory sentencing scheme that produced the 52-year sentence, violated the proportionate penalties clause, as applied to the defendant. *Gipson*, 2015 IL App (1st) 122451, ¶ 77. In so concluding, the court noted that the defendant had previously been declared unfit to stand trial, he was not at his "peak mental efficiency" when the shooting occurred, his mental health issues had never been addressed, and his impaired ability to process information might have affected his judgment. *Gipson*, 2015 IL App (1st) 122451, ¶ 74. In addition, the court noted that the defendant committed a crime in which "no one died" and that the codefendant, who inflicted worse damage, received a sentence of only 31 years' imprisonment. *Gipson*, 2015 IL App (1st) 122451, ¶ 75.

¶ 72       The facts in *Gipson* are alien to our case. Here, 20-year-old defendant murdered Moorea by stabbing and bludgeoning her multiple times, and then he concealed the crime. Defendant admitted perpetrating 10 prior incidents of domestic abuse toward Moorea. Witnesses to such prior abuse testified to its horrific nature, which included punching a pregnant Moorea in the stomach and beating Moorea with his fists. At sentencing, the State introduced a recording of a telephone call between defendant, while he was incarcerated in the county jail awaiting trial, and his sister. In that call, defendant coolly admitted to his sister that his trial strategy was to blame Moorea, to deflect responsibility from himself. The court noted that, as an adult

- 13 -

offender, defendant's mental health issues were addressed. The court considered evidence that defendant responded to life situations with violence.

¶ 73    We agree with the State that *People v. White*, 2020 IL App (5th) 170345, is apt. In *White*, the defendant was convicted of two counts of first degree murder and one count of concealment of a homicidal death and was sentenced to natural life imprisonment. *White*, 2020 IL App (5th) 170345, ¶¶ 4-5. The appellate court rejected the defendant's contention that the mere fact that he was 20 years of age when he committed the crimes qualified him as a "youthful offender," such that a mandatory life sentence was so disproportionate as to violate the eighth amendment. *White*, 2020 IL App (5th) 170345, ¶ 19. The court also rejected the defendant's challenge under the proportionate penalties clause, holding that the mandatory life sentence neither shocked the conscience nor was disproportionate to the offenses, given the violent nature of the murders and the defendant's culpability as an adult principal in planning, executing, and attempting to avoid responsibility for the crimes. *White*, 2020 IL App (5th) 170345, ¶ 29. Here, the evidence showed a conscienceless defendant to whom the trial court nevertheless granted leniency in not imposing an extended term.

¶ 74    In sum, defendant fails to persuade us that his sentence is so wholly disproportionate to the offense that it "shocks the moral sense of the community." See *Gipson*, 2015 IL App (1st) 122451, ¶ 69 (to succeed on a proportionate penalties claim, the defendant must demonstrate that the sentence is degrading, cruel, or " 'so wholly disproportionate to the offense that it shocks the moral sense of the community' " (quoting *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009))).

¶ 75                            *3. Excessive Sentence*

¶ 76    Lastly, defendant argues that his sentence is excessive. Defendant asserts that the trial court failed to give proper weight to his (1) childhood, during which his mother committed suicide and he was raised by an abusive alcoholic father, (2) youth, and (3) improving psychological outlook. Defendant asks this court to reduce his sentence. Reviewing courts have the power to reduce sentences, pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967). This power should be used "cautiously and sparingly." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court cannot alter a defendant's sentence absent an abuse of discretion by the trial court. *Alexander*, 239 Ill. 2d at 212. A sentence that is within the statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 31.

¶ 77    It is well established that a trial court has broad discretionary powers to impose a sentence and that the court's sentencing decision is entitled to great deference because it is in a better position than the appellate court to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Butler*, 2013 IL App (1st) 120923, ¶ 30. The reviewing court cannot substitute its judgment for that of the trial court because it would have weighed those factors differently. *Butler*, 2013 IL App (1st) 120923, ¶ 30.

¶ 78    Throughout his brief, defendant emphasizes his childhood. Defendant was born addicted and was later diagnosed with depression after his mother's suicide. He was also diagnosed as bipolar. Defendant's father was an abusive alcoholic. As a young adult, defendant was addicted to heroin. Defendant had also attempted suicide. According to defendant's letter to the trial

judge, which is included in an addendum to the presentence investigation report, defendant blames the murder of Moorea on his "horrible childhood" and "horrible way of being raised." Defendant claims that he was not given help for his mental disorders. However, the record indicates that he underwent multiple hospitalizations for those disorders.

¶ 79 To support his excessive-sentence claim, defendant essentially restates his *Miller* argument, contending that he should be treated as a juvenile for purposes of sentencing. In *LaPointe*, this court made clear that *Miller* does not apply to individuals who are over 18 years of age when their crimes were committed. *LaPointe*, 2018 IL App (2d) 160903, ¶ 47. Nothing about the facts of the instant case requires us to reconsider *LaPointe*.

¶ 80 Defendant argues that a psychological report shows that, with help, he can change. However, the report concludes that defendant is at high risk for recidivism. That report also describes defendant as "unreliable, reckless, irresponsible, has a desire to meet his own needs above others, and has been involved in criminal activities since a young age which have impacted his ability to succeed in multiple areas of his life." The report indicates that defendant experiences "intense angry feelings most of the time" and that he is "impulsive" and "lacks the ability to control his anger" effectively. The report also notes that defendant has a "positive attitude" toward criminal activity and an "unwillingness" to take responsibility for criminal behavior. The report notes that defendant's test results showed that he is "impulsive," manipulates others effectively, and feels angry and detached from others most of the time. The report indicates that defendant is likely to engage in "targeted, or planned violence" and that he experiences "a multitude of thoughts" that "predispose" him to engage in aggressive or violent acts.

¶ 81 The parties agreed that the sentencing limits for defendant's first degree murder conviction were a minimum of 20, and a maximum of 60, years' imprisonment. Additionally, the court found defendant eligible for an extended term of up to 100 years. Defendant does not challenge his eligibility for the extended term. Despite that eligibility, the court elected not to sentence defendant to an extended term. Under these circumstances, we cannot say that an aggregate 63-year sentence of incarceration is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. Accordingly, we reject defendant's argument that his sentence is excessive.

¶ 82                                                III. CONCLUSION

¶ 83 For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 84 Affirmed.